2007 UT App 101

**William MOORE and Mary Moore, Plaintiffs, Appellees, and Cross-appellants,**

v.

**Dan SMITH, individually and as Trustee of the Dan Irvin Smith Inter Vivos Trust; and Carol Smith, individually and as Trustee of the Carol L. Smith Inter Vivos Trust, Defendants, Appellants, and Cross-appellees.**

**No. 20050626–CA.**

Court of Appeals of Utah.

March 22, 2007.

Rehearing Denied April 23, 2007.

564

Justin R. Elswick and Justin D. Heideman, Ascione Heideman & McKay LLC, Provo, for Appellants and Cross-appellees.

Gregory B. Hadley and Paul D. Dodd, Hadley & Associates, Provo, for Appellees and Cross-appellants.

Before GREENWOOD, Associate P.J., DAVIS and THORNE, JJ.

## OPINION

GREENWOOD, Associate Presiding Judge:

¶ 1 Defendants Dan and Carol Smith (the Smiths) appeal (1) two trial court orders partially denying summary judgment; (2) a special verdict in favor of Plaintiffs William and Mary Moore (the Moores); [1] (3) an order denying the Smiths' rule 50(b) motion for judgment notwithstanding the verdict; (4) an order denying the Smiths' motion to set aside the judgment; and (5) an order granting the Moores attorney fees.

¶ 2 The Moores cross-appeal challenging (1) the trial court's grant of partial summary judgment on their fraudulent nondisclosure, contract, and negligent misrepresentation claims; (2) the trial court's refusal to award fees to their expert for time spent preparing for depositions; and (3) the trial court's order concerning attorney fees and costs. We affirm in part and reverse and remand in part.

## BACKGROUND

¶ 3 In 1993, Mr. Smith, a licensed general contractor and master electrician, built the home that is the subject of this litigation. Prior to completing construction, the Smiths lived in the home for approximately three weeks.

---

1. William Moore passed away in 2001 and Mary Moore became his successor in interest.

¶ 4 On or about January 26, 1994, Jack Peterson, the Chief Building Inspector for the City of Fillmore, Utah, (the City) issued a Certificate of Occupancy and Zoning Compliance (Certificate of Occupancy) for the property. A Certificate of Occupancy is issued "after the final inspection has been completed and [the inspector] find[s] the construction meets the intent of the building code in place at the time of the construction." However, in spite of these requirements, Mr. Peterson issued the document without performing a further inspection to determine whether the home complied with the City's grading and footing requirements.[2] Mr. Peterson failed to inspect the grading and footings because, at the time of the final inspection, the ground was excessively muddy.[3] Although Mr. Smith assured Mr. Peterson he would complete the finish grading in the spring once the soil had dried out, the home was sold before spring arrived. Consequently, Mr. Peterson did not inspect the grading or footings prior to the sale of home.

¶ 5 A short time after the Certificate of Occupancy was issued, the Moores learned the Smiths were interested in selling the house. The Moores walked through the home with the Smiths and did not observe any defects. To the contrary, the Moores were impressed with the home. During the walkthrough, the Moores asked the Smiths if there was anything they needed to know about the home, and Mr. Smith said, "[I]t's a new house."

¶ 6 Four days later, the Smiths and the Moores signed an Earnest Money Sales Agreement (EMSA) for a purchase price of $83,000. The EMSA contained the following provisions:

B. INSPECTION. Unless otherwise indicated, Buyer agrees that Buyer is purchasing said property upon Buyer's own examination and judgment and not by reason of any representation made to Buyer by Sell-

er or the Listing or Selling Brokerage as to its condition, size, location, present value, future value, income herefrom.... Buyer accepts the property in "as is" condition subject to Seller's warranties as outlined in Section 6. In the event Buyer desires any additional inspection, said inspection shall be allowed by Seller but arranged for and paid by Buyer.

C. SELLER WARRANTIES. Seller warrants that: (a) Seller has received no claim nor notice of any building or zoning violation concerning the property which has not or will not be remedied prior to closing; (b) all obligations against the property including taxes, assessments, mortgages, liens or other encumbrances of any nature shall be brought current on or before closing; and (c) the plumbing, heating, air conditioning and ventilating systems, electrical system, and appliances shall be sound or in satisfactory working condition at closing.

. . . .

6. SELLER WARRANTIES. In addition to the warranties contained in Section C, the following items are also warranted: none [the word none is handwritten onto the document].

. . . .

L. COMPLETE AGREEMENT—NO ORAL AGREEMENTS. This instrument constitutes the entire agreement between the parties and supersedes and cancels any and all prior negotiations, representations, warranties, understandings or agreements between the parties. There are no oral agreements which modify or affect this agreement. This Agreement cannot be changed except by mutual written agreement of the parties.

The sale closed on May 2, 1994. Prior to closing, the Moores did not obtain a professional home inspection.

---

2. At the time the Certificate of Occupancy was issued, the City's 1991 Building Code was in effect. According to Mr. Peterson's testimony at trial, the 1991 version of the code contained two components for proper grading: (1) the soil must descend from the house at a two percent slope, and (2) the home's footings must be at least thirty inches deep.

3. Although he did not inspect the grading and footings at the final inspection, Mr. Peterson testified at trial that he observed the footings prior to the final inspection, recognized they were shallow, and informed Mr. Smith accordingly.

¶7 In April 2000, a contractor began installing a fence on the Moores' property. In the course of construction, the contractor noticed that the footings on which the home's foundation rested were not buried to the required depth. As a result of this discovery, the Moores hired a professional building inspector to inspect the home. The building inspector discovered forty-two Uniform Building Code violations. Based on the home inspector's findings, the Moores filed this action in August 2000, alleging breach of contract, negligent misrepresentation, fraudulent nondisclosure, fraudulent misrepresentation, and violation of Utah's consumer sales practices act.[4] The Moores also requested rescission and punitive damages.

¶8 The Smiths filed their first of six motions for summary judgment on February 26, 2001, claiming that the contract, rescission, and consumer sales practices claims were barred by the applicable statutes of limitations and that the fraudulent nondisclosure and misrepresentation claims were not pleaded properly. The Moores responded that the discovery rule, which tolls the statute of limitations until a party discovers the cause of action, applied to the facts of this case, and the trial court agreed. The trial court also ruled that the fraudulent nondisclosure and misrepresentation claims were properly pleaded and not appropriate for disposition on summary judgment. However, the trial court ruled, sua sponte, that the negligent misrepresentation claims were barred by application of the merger doctrine.

¶9 In May 2003, after some discovery had been conducted, the Smiths filed a second motion for summary judgment, arguing that the Moores' claims were barred by the doctrine of caveat emptor because all but seven of the forty-two alleged defects were patent

and therefore discoverable by reasonable care. The Smiths also argued that the claims were barred by the statute of limitations contained in Utah Code section 78–12–21.5, entitled "Actions related to improvements in real property" (the Statute), see Utah Code Ann. § 78–12–21.5 (1999) (amended 2004), and that there were insufficient facts to support the claim for fraudulent misrepresentation. The trial court granted the Smiths' motion for summary judgment as to thirty-seven of the forty-two patent defects identified by the Moores under a claim for fraudulent misrepresentation. The court denied summary judgment as to the Moores' remaining claims.

¶10 The Smiths filed four additional motions for summary judgment seeking dismissal of several of the remaining claims. Relevant for purposes of this appeal, the Smiths sought dismissal of the breach of contract claims arguing that none of the defects at issue fell within Section C of the EMSA. In response, the trial court dismissed all of the Moores' breach of contract claims except for the claims based on the footings and grading. It also dismissed the Moores' consumer sales practice, mutual mistake, and fraudulent misrepresentation claims.

¶11 The Moores pursued three of their remaining claims at trial: breach of contract and fraudulent nondisclosure regarding the footings and grading, and fraudulent nondisclosure regarding the windows.[5] The jury returned a special verdict in favor of the Moores on their breach of contract and fraudulent nondisclosure claims as they pertained to the footings and grading defects. The Smiths prevailed on the fraudulent nondisclosure claim regarding the windows. The jury awarded the Moores $30,680 in

---

4. The Moores subsequently amended their complaint to include a claim for mutual mistake of fact.

5. The Smiths claim five defects survived summary judgment under the Moores' fraudulent misrepresentation claims: 9, 11, 26, 27, and 39. But there were actually six, because defects 27 and 28, which related to footings and grading and were combined by the trial court, also survived summary judgment. Of the six defects, the Moores chose to try only three. Therefore, we consider claims regarding the other three defects

to be waived. However, with the exception of defects 27 and 28, which relate to the grading and footings, and defect 39, which relates to insulation, it is unclear which of the remaining defects, if any, were brought to trial. Neither party provides a complete list of the defects. The Smiths provide a list of defects, however, there is no defect 11, and defect 9 relates somewhat to windows: "No counter-flashing at windows or doors, has caused water damage." This may or may not be the defect regarding the windows that the Moores brought to trial.

damages. The Smiths then moved respectively for a directed verdict, a judgment notwithstanding the verdict, and a motion for relief from judgment in accordance with rule 50(b) of the Utah Rules of Civil Procedure, all of which were denied.

¶ 12 The Moores then filed a motion for attorney fees and costs, seeking $120,645.88 in fees and $35,131.53 in costs. A hearing on the motion was held, and the trial court ruled that the Moores were entitled only to reimbursement for the fees and costs related to the breach of contract claim. The trial court also ordered the Moores' attorneys to separate the request for fees into successful and unsuccessful claims. The Moores' attorneys resubmitted the request for fees and costs with only a few minor alterations. More specifically, the Moores' attorneys reduced their request by approximately $4000, claiming that "much of the fees are so closely related and intertwined with the breach of contract claim as to be indistinguishable and can not [sic] now be separated." The trial court found this unacceptable and, after review of the request, awarded the Moores $40,000 in attorney fees and $10,000 in expenses and costs.

¶ 13 The Smiths appeal, claiming the trial court (1) applied the wrong version of the Statute, see Utah Code Ann. § 78–12–21.5 (amended 2004); (2) incorrectly applied an equitable discovery rule to the case; (3) inappropriately submitted questions of law to the jury; and (4) erred in failing to dismiss the Moores' fraudulent nondisclosure claim.

¶ 14 The Moores cross-appeal, claiming that the trial court erred by (1) improperly granting partial summary judgment as to their fraudulent nondisclosure, breach of contract, and negligent misrepresentation claims; (2) failing to award compensation for their experts' time spent preparing for depositions; (3) refusing to award attorney fees for claims other than the breach of contract claim; and (4) reducing attorney fees and costs.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 15 The Smiths first argue that the trial court erred by applying the incorrect statute of limitations and discovery rule to the facts of this case. "The applicability of a statute of limitations and the applicability of the discovery rule are questions of law, which we review for correctness." *Russell Packard Dev., Inc. v. Carson,* 2005 UT 14, ¶ 18, 108 P.3d 741 (quotations and citation omitted).

■ ¶ 16 Next, the Smiths argue that the trial court committed plain error by submitting questions of law to the jury for decision in a special verdict. "To demonstrate plain error, [the appellant] must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *Berkshires, L.L.C. v. Sykes,* 2005 UT App 536, ¶ 21, 127 P.3d 1243 (quotations and citation omitted).

■ ¶ 17 The Smiths also assert that the trial court erred in failing to grant their motions for summary judgment. Whether a party is entitled to summary judgment is a question of law, which we review for correctness. *See Mitchell v. Christensen,* 2001 UT 80, ¶ 8, 31 P.3d 572.

■ ¶ 18 Finally, the Smiths argue that the trial court erred in failing to grant their motion for a directed verdict and motion to set aside the judgment regarding the Moores' fraudulent nondisclosure claims. A directed verdict is appropriate "only if, [after] examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.,* 1999 UT 14, ¶ 3, 975 P.2d 467. The motion "can be granted only when the moving party is entitled to judgment as a matter of law." *Id.* (quotations and citation omitted).

■ ¶ 19 Regarding a motion to set aside the judgment, "[t]he district court judge is vested with considerable discretion under Rule 60(b) in granting or denying a motion to set aside a judgment." *Katz v. Pierce,* 732 P.2d 92, 93 (Utah 1986). To successfully challenge a denial of a motion to set aside the verdict, a defendant must clearly demonstrate an abuse of discretion. *See id.* "That some basis may exist to set aside the

[judgment] does not require the conclusion that the court abused its discretion in refusing to do so when facts and circumstances support the refusal." *Id.*

¶ 20 On cross appeal, the Moores challenge the trial court's grant of partial summary judgment in favor of the Smiths. Whether a party is entitled to summary judgment is a question of law, which we review for correctness. *See Mitchell,* 2001 UT 80 at ¶ 8, 31 P.3d 572.

¶ 21 Next, the Moores challenge the trial court's decision to not compensate their experts for time spent preparing for depositions by the Smiths. Whether rule 26(b)(4) of the Utah Rules of Civil Procedure, *see* Utah R. Civ. P. 26(b)(4)(C)(i), allows recovery for expert preparation time is a question of law, and the trial court's legal conclusions are reviewed for correctness. *See Pratt v. Mitchell Hollow Irrigation Co.,* 813 P.2d 1169, 1171 (Utah 1991).

¶ 22 The Moores also challenge the trial court's award of attorney fees. The trial court's grant of attorney fees is reviewed for an abuse of discretion, and we grant considerable deference to the trial court. *See Willey v. Willey,* 951 P.2d 226, 230 (Utah 1997).

¶ 23 Finally, the Moores assert that the trial court erred in determining costs. "The trial court's interpretation of the meaning of costs in the contract is a question of law. Thus, we accord the trial court's legal conclusions regarding the contract no deference and review them for correctness." *Chase v. Scott,* 2001 UT App 404, ¶ 10, 38 P.3d 1001 (quotations and citations omitted).

## ANALYSIS

### I. Statute of Limitations

¶ 24 The Smiths argue that the trial court applied the incorrect version of the statute of limitations. However, we will not address the merits of the Smiths' claim because it was not preserved for appeal. *See State v. Irwin,* 924 P.2d 5, 7 (Utah Ct.App. 1996) ("It is a well-established rule that a defendant who fails to bring an issue before the trial court is generally barred from raising it for the first time on appeal."). The Smiths failed to raise this claim with the trial court and, after acknowledging this fact, attempt to argue plain error for the first time in their reply brief. Consequently, we will not further address the Smiths' statute of limitations argument. *See Romrell v. Zions First Nat'l Bank, N.A.,* 611 P.2d 392, 395 (Utah 1980) ("As a general rule, an issue raised initially in a reply brief will not be considered on appeal....").

¶ 25 The Smiths also argue that the 2003 version[6] of the Statute, not the 1999 version, applies to this case. The trial court applied the 1999 version, *see* Utah Code Ann. § 78–12–21.5(3)(a) (1999) (amended 2004), and the Smiths did not preserve this argument below, *see Irwin,* 924 P.2d at 7. Accordingly, we analyze the application of the equitable discovery rule under the 1999 version of the Statute.[7]

### II. The Discovery Rule

¶ 26 The Smiths next argue that the trial court was precluded from applying the discovery rule to the facts of this case, and without application of the discovery rule, the Moores' breach of contract claims were barred by the statute of limitations. The discovery rule operates to toll a statute of limitations "until the discovery of facts forming the basis for the cause of action." *Russell Packard Dev., Inc. v. Carson,* 2005 UT 14, ¶ 21, 108 P.3d 741 (quotations and citation omitted). There are two types of discovery rules: a "statutory discovery rule" and an "equitable discovery rule." *Id.* at ¶¶ 21, 24.

---

6. Although the Smiths argue for the application of the 2003 version of the Statute, we assume they are referring to the 2004 version, because section 78–12–21.5 was not amended in 2003. *See* Utah Code Ann. § 78–12–21.5 (2004) (History).

7. We note that this action was filed in August 2000, prior to the effective date of the 2004 amended statute, and necessarily alleged accrual of the action prior to that date. *See id.* § 78–12–21.5(11) ("This section applies to all causes of action that accrue after May 3, 2003, notwithstanding that the improvement was completed or abandoned before May 3, 2004.").

A statutory discovery rule is one that is included within the governing statute, and an equitable discovery rule applies when a statute does not include a statutory discovery rule. *See id.* An equitable discovery rule may toll a fixed statute of limitations period when the trial court finds that "a plaintiff d[id] not become aware of the cause of action because of the defendant's concealment or misleading conduct," or that "the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action." *Id.* at ¶ 25 (quotations and citation omitted). The equitable discovery rule applies "*only* where a statute of limitations does not, by its own terms, already account for such circumstances—i.e., where a statute of limitations lacks a statutory discovery rule." *Id.*

▮▮ ¶ 27 In this instance, the Moores fully briefed an argument to the trial court asserting that exceptional circumstances warranted the application of the equitable discovery rule, and the trial court agreed. On appeal, the Smiths do not challenge whether exceptional circumstances actually existed; rather, they argue that Utah Code section 78–12–21.5(3)(a) prohibits the application of the discovery rule to breach of contract claims. *See* Utah Code Ann. § 78–12–21.5(3)(a) (1999) (amended 2004). Because the Smiths do not challenge whether exceptional circumstances warranted the application of the discovery rule to the facts of this case, we review only the trial court's determination that an equitable discovery rule could be asserted as to the Moores' breach of contract claims.

¶ 28 Section 78–12–21.5(3) states that

(a) An action by or against a provider based in *contract or warranty* shall be commenced *within six years of the date of completion* of the improvement or abandonment of construction. (b) *All other actions* by or against a provider shall be commenced *within two years from the earlier of the date of discovery of a cause of*

*action* or the date upon which a cause of action should have been discovered through reasonable diligence.

*Id.* § 78–12–21.5(3) (1999) (amended 2004) (emphasis added). Because the Statute contains an internal discovery rule regarding all claims *except for contract actions,* the Smiths argue the legislature intended to hold contract claims related to property improvements outside of the application of any discovery rule. However, the Smiths provide no authority for this legislative intent argument, and we are not persuaded by it.

▮▮ ¶ 29 While it is true that the Statute contains an internal discovery rule for non-contract actions, it is also clear that the Statute does not contain an internal discovery rule regarding contract claims. Therefore, the trial court was not prohibited from applying an equitable discovery rule to the Moores' breach of contract claim. Consequently, we conclude that the trial court did not err in applying an equitable discovery rule.[8]

### III. The Special Verdict and Jury Instructions

▮▮▮ ¶ 30 The Smiths next argue that the trial court committed plain error by submitting questions of law to the jury and failing to ask the jury specific questions. However, we will not address the merits of this claim, even under plain error, because the Smiths invited the alleged error of which they now complain. "A jury instruction may not be assigned as error, even if such instruction would otherwise constitute manifest injustice, 'if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction.'" *State v. Pinder,* 2005 UT 15, ¶ 62, 114 P.3d 551 (quoting *State v. Hamilton,* 2003 UT 22, ¶ 54, 70 P.3d 111); *see also State v. Geukgeuzian,* 2004 UT 16, ¶ 9, 86 P.3d 742. "This prevents a party from tak[ing] advantage of an error committed at trial when that party led the trial court into committing the error." *Hamilton,* 2003 UT 22 at ¶ 54, 70

---

**8.** In a related claim, the Smiths assert that the trial court needed, yet failed, to determine the date the Moores discovered the defect. Again, this argument was not preserved with the trial court, and we do not address it on appeal. *See State v. Irwin,* 924 P.2d 5, 7 (Utah Ct.App.1996).

P.3d 111 (alteration in original) (quotations and citation omitted).

¶ 31 In this case, the trial court met with counsel for both parties in chambers to specifically discuss the proposed jury instructions and the special verdict form. During the meeting, the Smiths' attorney made no objection to the special verdict form. A short time later in the courtroom, the trial court stated, "The Court has met with counsel in chambers and we've reviewed the jury instructions and the proposed verdict form." The trial court then asked the parties if they had any objections to the jury materials. Again, Smiths' counsel made no objection. Because the Smiths' attorney actively represented to the trial court that he had no objection to the special verdict form, we do not further address the Smiths' claim for plain error. *See id.* (refusing to address objection to jury instructions where "counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction").

### IV. Fraudulent Nondisclosure

¶ 32 The Smiths further argue that the trial court erred by failing to dismiss the Moores' claims for fraudulent nondisclosure. More specifically, the Smiths argue that because the Moores bought a used home "as is," caveat emptor applied, thus precluding the Moores' claim. The Smiths also assert that because the Moores failed to obtain a home inspection, the Smiths had no duty to disclose patent defects. On cross-appeal, the Moores take the opposite stance: not only was the trial court correct in refusing to dismiss their fraudulent nondisclosure claims regarding the grading and footings defects, but it erred in dismissing their other claims for fraudulent nondisclosure.[9]

¶ 33 Approximately one month prior to the parties submitting their briefs in this appeal, the supreme court addressed fraudulent nondisclosure claims in the context of home sales in *Yazd v. Woodside Homes*

*Corp.*, 2006 UT 47, 143 P.3d 283. Although neither party referred to or relied on *Yazd* in their briefs, or provided supplemental submissions to this court, *see* Utah R.App. Proc. 24(j) (addressing citation of supplemental authorities), we nevertheless apply it to the facts of this case as binding precedent. In *Yazd*, the court explained that a claim for fraudulent nondisclosure rests on three elements: (1) a legal duty to communicate, (2) undisclosed material information, and (3) a showing that the information was known to the party who failed to disclose. *See Yazd*, 2006 UT 47 at ¶ 10, 143 P.3d 283. The supreme court specifically emphasized that duty should be analyzed before any other elements. *See id.* at ¶ 14. After all, if there is no duty to communicate information, there is no entitlement to a remedy. *See id.* Therefore, we first address whether the Smiths had a legal duty to communicate to the Moores.

¶ 34 Whether a duty exists is strictly a question of law; it grows out of the relationship between the parties, and the duties created by that relationship. *See id.* at ¶¶ 14–15.

A relationship that is highly attenuated is less likely to be accompanied by a duty than one, for example, in which parties are in privity of contract. Age, knowledge, influence, bargaining power, sophistication, and cognitive ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another. Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage.

*Id.* at ¶ 16.

¶ 35 Applying these policy considerations to the context of home sales by builder-sellers, the supreme court explained: "Mod-

---

9. Although the parties spend significant portions of their briefs discussing whether the home was used or new, whether the Moores were required to obtain a home inspection, and which of the defects at issue were patent or latent, in light of

the recent supreme court decision *Yazd v. Woodside Homes Corp.*, 2006 UT 47, 143 P.3d 283, none of these issues are dispositive on appeal. *See generally id.*

ern home construction requires a high degree of knowledge and expertise.... [T]he disparity in skill and knowledge between home buyers and builder-contractors leads buyers to rely on the builder-contractor's expertise." *Id.* at ¶ 24. Based on this reasoning, the supreme court concluded that the defendant home builder-sellers in *Yazd* owed a duty to the home-buyer plaintiffs. *See id.* at ¶ 18. Specifically, the court stated that it was the seller's "status as builder-contractor that g[ave] rise to its legal duty to the home buyers. The communication of material information to [the home buyers] is one of the obligations that flow from [the builder-contractor's] assumption of its legal duty." *Id.*

 ¶ 36 The same is true here. Because Mr. Smith was a licensed general con-

tractor and built the home at issue,[10] and because the parties were in privity of contract with each other, the Smiths owed a duty to disclose material information to the Moores regardless of the fact that the Smiths had lived in the home for only a short period of time before selling it.[11] Consequently, we affirm the trial court's refusal to dismiss all of the Moores' fraudulent nondisclosure claims on summary judgment and reverse the dismissal of the remainder of the fraudulent nondisclosure claims.[12] Moreover, we remand to the trial court for a determination of three jury questions: whether the thirty-seven defects previously dismissed on summary judgment were material,[13] whether the Smiths had knowledge of the defects, and whether they failed to disclose those defects

10. Mr. Smith was also a master electrician.

11. *Yazd* did not address the question of whether builder-contractors have a duty to remote purchasers, and we do not address that question here. *See generally Yazd*, 2006 UT 47, 143 P.3d 283. The three-week occupancy of the home by the Smiths and contract to sell to the Moores before completion of construction, however, are insufficient to remove this case from the reach of *Yazd*.

12. The Smiths briefly argue that the Moores cannot recover for both fraudulent and negligent misrepresentation regarding the same defects. We agree. A claim for fraudulent misrepresentation requires a plaintiff to demonstrate (1) a legal duty to communicate, (2) undisclosed material information, and (3) that the information was known to the party who failed to disclose. *See id.* at ¶ 10. Similarly, a claim for negligent misrepresentation requires a party to demonstrate that (1) a party carelessly or negligently makes a false representation "expecting the other party to rely and act thereon," (2) the plaintiff actually relies on the statement, and (3) suffers a loss as a result of that reliance. *Smith v. Frandsen*, 2004 UT 55, ¶ 9, 94 P.3d 919. "[I]n addition to affirmative misstatements, an omission may be actionable as a negligent misrepresentation where the defendant has a duty to disclose." *Id.* at ¶ 11.

Although the two claims are similar, negligent misrepresentation "carries a lesser mental state, requiring only that the seller act *carelessly* or *negligently*." *Robinson v. Tripco*, 2000 UT App 200, ¶ 13, 21 P.3d 219. Fraudulent concealment, on the other hand, requires the seller to have acted "knowingly or recklessly." *Id.* at ¶ 13 n. 3. Because the facts required to prove both negligent misrepresentation and fraudulent conceal-

ment are similar, and the only difference between the two claims is a lesser mental state for negligent misrepresentation, we conclude that the Smiths can be liable for only one or the other regarding each defect at issue in this case.

13. Because we remand for a determination of materiality, we note that in *Yazd* the supreme court also clarified the meaning of "material" in the context of fraudulent concealment actions:

We take this opportunity to clarify the definition of materiality as the term is used as an element of fraudulent concealment and fraudulent nondisclosure. We believe that requisite clarity can be achieved by deleting the word "some" from the definition we adopted in *Hermansen [v. Tasulis]*, 2002 UT 52, ¶ 29, 48 P.3d 235.

To be material, the information must be "important." Importance, in turn, can be gauged by the degree to which the information could be expected to influence the judgment of a person buying property or assenting to a particular purchase price.

*Yazd*, 2006 UT 47 at ¶¶ 33–34, 143 P.3d 283.

We also note that the *Yazd* decision did not address the possible relevance of not obtaining a home inspection or obviousness of defects. Therefore, these issues may have some bearing on materiality and failure to disclose. *See Mitchell v. Christensen*, 2001 UT 80, ¶ 13, 31 P.3d 572 (noting that "although the proper standard for the discoverability of a defect is that of an ordinary prudent person, this does not mean that inspection by an expert will never be required," and acknowledging that "under certain circumstances, a reasonably prudent buyer should be put on notice that a possible defect exists, necessitating either further inquiry of the owner of the home, who is under a duty not to engage in fraud, or inspection by someone with sufficient

to the Moores.[14] Remand will not include, of course, the issues already tried to the jury, or those that the Moores elected not to try.

## VI. Breach of Contract

¶ 37 On cross-appeal, the Moores claim that the trial court erred in concluding that only the grading and footings defects fell within Section C of the EMSA. In relevant part, Section C of the EMSA states, "Seller has received no claim or notice of any building or zoning violation concerning the property which has not or which will not be remedied prior to closing. . . ." Based on this provision, the trial court dismissed all breach of contract claims related to defects for which Mr. Smith had allegedly received no actual notice. The Moores assert that the trial court erred in reaching this conclusion because knowledge should have been imputed to the Smiths since Mr. Smith built the home, was a licensed general contractor, and had knowledge of the applicable building code. Regardless of what the building inspector told him, the Moores argue that Mr. Smith "either knew or should have known of the defects." [15]

¶ 38 "[T]he law imputes to builders and contractors a high degree of specialized knowledge and expertise with regard to residential construction." *Smith v. Frandsen*, 2004 UT 55, ¶ 18, 94 P.3d 919 (citing *McDonald v. Mianecki*, 79 N.J. 275, 398 A.2d 1283, 1292 (1979) ("Whether the builder be large or small, the purchaser relies upon his superior knowledge and skill, and he impliedly represents that he is qualified to erect a habitable dwelling. He is also in a better position to prevent the existence of major defects."); *Groff v. Pete Kingsley Bldg., Inc.*, 374 Pa.Super. 377, 543 A.2d 128, 133 (1988) ("The professional builder is expected to have the skill and expertise to know how to guard against potential struc-

tural problems. Moreover, the builder is in the best position to prevent structural defects."); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 735 (Wyo.1979) ("Consumer protection demands that those who buy homes are entitled to rely on the skill of the builder and that the house is constructed so as to be reasonably fit for its intended use.")); *see also Yazd v. Woodside Homes Corp.*, 2006 UT 47 at ¶¶ 24–25, 143 P.3d 283, (recognizing imputed knowledge standard). Because knowledge is imputed to builders and contractors, we conclude that the trial court erred in determining that the Smiths were liable only for defects of which they had actual knowledge. We also remand for a determination of which of the remaining defects the Smiths had actual or imputed knowledge of, and which of those defects also fell within Section C of the EMSA.

## VII. Negligent Misrepresentation

¶ 39 The Moores next argue, and the Smiths concede, that the trial court erred when it ruled, sua sponte, that the merger doctrine barred the Moores' negligent misrepresentation claims. We agree. *See Pavoni v. Nielsen*, 2000 UT App 74, ¶¶ 36–37, 999 P.2d 595 (concluding that any express warranties made in an identical EMSA survived delivery of the deed). The Moores claim that the Smiths made negligent misrepresentations in the express warranties of the EMSA because they never intended to remedy the defects in the house. The Smiths counter that although contract claims under the EMSA's express warranty survive the abrogation clause, the claims for negligent misrepresentation fail because of the trial court's error in applying the wrong statute of limitations and because of the doctrine of caveat emptor. We have previously determined that the trial court did not err in its decision regarding the statute of limitations. As for the caveat emptor theory, the su-

expertise to appraise the defect." (citations omitted)).

14. The Smiths advanced the same arguments discussed above in their motion for judgment notwithstanding the verdict and rule 50(b) motion. Because we conclude, as a matter of law, that the Smiths do not prevail on any of their claims on appeal, we need not address their

same arguments in the context of their motion for judgment notwithstanding the verdict and rule 50(b) motion.

15. In support of their argument, the Moores point out that Mr. Smith admitted he was knowledgeable of the standards of the Uniform Building Code and that Mr. Smith had discussed several of the defects with the home inspector.

preme court has held that a claim for negligent misrepresentation lies "where the defendant has a duty to disclose." *Frandsen,* 2004 UT 55 at ¶ 11, 94 P.3d 919. In *Yazd,* the supreme court held that a legal duty exists between a builder-seller and a buyer. *See Yazd,* 2006 UT 47 at ¶ 18, 143 P.3d 283. Therefore, the negligent misrepresentation claims are viable.

¶ 40 Accordingly, we reverse the trial court's grant of summary judgment dismissing the Moores' claims for negligent misrepresentation and remand for further proceedings. We observed earlier, at footnote twelve, that these claims may be redundant to the fraudulent misrepresentation claims. The claims may also duplicate, in terms of damages, the breach of contract claim for which the jury awarded damages.

### VIII. Fees for Experts' Time Spent Preparing for Depositions

¶ 41 The Moores further argue that the trial court erroneously concluded they were not entitled to recover fees for their experts' time spent preparing for depositions. Rule 26(b)(4)(C)(i) of the Utah Rules of Civil Procedure provides: "The court shall require that the party seeking discovery pay the expert a reasonable fee for *time spent in responding to discovery.*" Utah R. Civ. P. 26(b)(4)(C)(i) (emphasis added). The question of whether "time spent in responding to discovery," *id.,* includes time spent preparing for depositions is an issue of first impression for Utah courts. Because Utah rule 26(b)(4)(C)(i), *see id.,* is identical to federal rule 26(b)(4)(C)(i), *see* Fed.R.Civ.P. 26(b)(4)(C)(i), case law interpreting the federal rule is instructive. *See Oakwood Vill., L.L.C. v. Albertsons, Inc.,* 2004 UT 101, ¶ 12 n. 1, 104 P.3d 1226 ("When, as here, there is almost no case law interpreting the Utah rule and the Utah and federal rules are identical, we 'freely resort to federal law as a useful guide.'" (quoting *Plumb v. State,* 809 P.2d 734, 741 n. 9 (Utah 1990))).

¶ 42 Federal courts interpreting rule 26(b)(4) are split on whether the rule allows for parties to recoup fees from opposing parties for time spent preparing for the opposition's depositions. However, a slim majority

provides for such recovery, on the condition that the recovered fees are reasonable. *Compare Boos v. Prison Health Servs.,* 212 F.R.D. 578, 578 (D.Kan.2002) (mem.) (allowing recovery of expert's reasonable fees for time spent preparing for depositions), *Collins v. Village of Woodridge,* 197 F.R.D. 354, 357 (N.D.Ill.1999) (mem.) ("The Court believes the better reading of Rule 26(b)(4)(C)(i) is that the expert's reasonable fees for preparation time are recoverable by the party who tendered the expert."), *McNerney v. Archer Daniels Midland,* 164 F.R.D. 584, 587 (W.D.N.Y.1995) (allowing recovery of expert's reasonable fees for time spent preparing for depositions), *Hose v. Chicago & N.W. Transp. Co.,* 154 F.R.D. 222, 228 (S.D.Iowa 1994) (disagreeing with "other cases denying an expert compensation for time spent preparing for the deposition"), *Hurst v. United States,* 123 F.R.D. 319, 321 (D.S.D.1988) (allowing recovery of expert's reasonable fees for time spent preparing for depositions), *American Steel Prods. Corp. v. Penn Cent. Corp.,* 110 F.R.D. 151, 153 (S.D.N.Y.1986) (same), *and Carter–Wallace, Inc. v. Hartz Mountain Indus., Inc.,* 553 F.Supp. 45, 53 (S.D.N.Y.1982) (same), *with Rhee v. Witco Chem. Corp.,* 126 F.R.D. 45, 47 (D.Ill.1989) (allowing recovery under rule 26(b)(4) only in limited circumstances, "such as in a complex case where the expert's deposition has been repeatedly postponed over long periods of time by the seeking party causing the expert to repeatedly review voluminous documents"), *M.T. McBrian, Inc. v. Liebert Corp.,* 173 F.R.D. 491, 493 (N.D.Ill.1997) (allowing recovery for expert deposition preparation time only if the litigation is complex and there "has been [a] considerable lapse of time between an expert's work on the case and the date of his actual deposition"), *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.,* 154 F.R.D. 212, 214 (E.D.Wis.1994) (same), *EEOC v. Sears, Roebuck & Co.,* 138 F.R.D. 523, 526 (N.D.Ill.1991) (agreeing with holding in *Rhee,* 126 F.R.D. at 47), *and Benjamin v. Gloz,* 130 F.R.D. 455, 457 (D.Colo. 1990) (same).

¶ 43 Courts granting the sought after recovery provide the following reasoning: (1) "Time spent preparing for a deposition is, literally speaking, time spent in responding

to discovery (except where the deposition preparation time actually constitutes *trial* preparation, which we conclude is not the case here given the lengthy lapse of time between the depositions and the trial)," *Collins*, 197 F.R.D. at 357; (2) "The goal of [r]ule 26(b)(4)(C) is to compensate experts for their time spent in participating in litigation and to prevent one party from unfairly obtaining the benefit of the opposing party's expert work free from cost," *Hurst*, 123 F.R.D. at 321; (3) "[B]ecause depositions are the only type of discovery under ... [r]ule 26(b)(4)—it would have been relatively easy for the [r]ule's drafters to limit recovery to the time actually spent appearing for the deposition if that was what they intended to do," *Collins*, 197 F.R.D. at 357; and (4) compensating an expert for time spent preparing for a deposition may actually reduce costs by decreasing the length of time spent at a deposition. *See Hose*, 154 F.R.D. at 228.

¶ 44 A few courts hold that such fees are generally not recoverable unless there are exceptional circumstances or complex or unusual issues. *See, e.g., S.A. Healy Co.*, 154 F.R.D. at 214; *Sears, Roebuck & Co.*, 138 F.R.D. at 526; *Rhee*, 126 F.R.D. at 47–48. The Northern District of Illinois rejects these cases on grounds that they require something other than a plain language reading of rule 26:

> Either the phrase "time spent responding to discovery" includes deposition preparation time, or it does not. If it does not, then there is no basis under Rule 26(b)(4)(C) or any other provision of the Federal Rules to shift such fees. In short, the Rule on its face does not permit a construction that says that such fees *may not* be awarded, but still somehow allows for them in unusual or exceptional cases.
>
> The Court believes that the better reading of Rule 26(b)(4)(C)(i) is that the expert's reasonable fees for preparation time are recoverable by the party who tendered the expert.

*Collins*, 197 F.R.D. at 357.

¶ 45 Although the cases interpreting the federal rule are instructive, there is one sig-

nificant distinction between the Federal Rules of Civil Procedure and the Utah Rules of Civil Procedure that has some bearing on our conclusion as to this matter. Unlike the Federal Rules of Civil Procedure, the Utah Rules of Civil Procedure impose a limit on the amount of time between when an expert report is completed and a deposition on the report is taken. Rule 26(b)(4)(A) of the Utah Rules of Civil Procedure mandates the following: "If a[n expert] report is required under Subdivision (a)(3)(B), any deposition shall be conducted *within 60 days* after the report is provided." Utah R. Civ. P. 26(b)(4)(A) (emphasis added). In contrast, rule 26(b)(4)(A) of the Federal Rules of Civil Procedure states, "If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted *until after* the report is provided." [16] Fed.R.Civ.P. 26(b)(4)(A) (emphasis added).

¶ 46 Based on a review of federal case law and our own reading of rule 26(b)(4), including the fact that rule 26 specifically requires expert depositions to be taken relatively quickly—i.e., within sixty days after a report is provided, *see* Utah R. Civ. P. 26(b)(4)—we conclude that fees for expert preparation time are recoverable as long as the fees are reasonable. Not only does the plain language of the rule fail to explicitly exclude recovery for an expert's time spent preparing for a deposition, but the generalized language also allows for it: "The court shall require that the party seeking discovery pay the expert a reasonable fee for *time spent in responding to discovery.* ..." Utah R. Civ. P. 26(b)(4)(C)(i) (emphasis added). Because we conclude that an expert's time spent preparing for a deposition constitutes time spent in responding to discovery, we remand to the trial court for a determination of whether the fees sought are reasonable.

¶ 47 Because this is an issue of first impression in Utah, we think it worthwhile to note that when determining reasonableness,

---

**16.** Subsections (a)(3)(B) and (a)(2)(B) are substantively similar in that they both enumerate required disclosures regarding expert reports.

*See* Utah R. Civ. P. 26(a)(3)(B); Fed.R.Civ.P. 26(a)(2)(B).

the federal courts examine several factors, including the number of hours spent preparing for the deposition, the amount of material needing to be reviewed, the scope of the deposition, and the time between the expert's preparation of the report and the taking of the deposition.[17] *See, e.g., Collins v. Village of Woodridge,* 197 F.R.D. 354, 357 (N.D.Ill. 1999) (mem.); *McNerney v. Archer Daniels Midland,* 164 F.R.D. 584, 587 (W.D.N.Y. 1995). Although we do not make these factors mandatory, we consider them salutary. Of course, the trial court will also need to determine if the amount of experts' fees is reasonable.

## IX. Attorney Fees and Costs

¶ 48 The Moores next assert that the trial court erred by (1) refusing to award fees and costs on all of their claims regardless of whether they were successful on them; (2) requiring the Moores to categorize the fees sought in terms of how they related to successful and unsuccessful claims; (3) limiting the cost award to costs that came within rule 54(d) of the Utah Rules of Civil Procedure; and (4) arbitrarily awarding a smaller amount of fees and costs than requested.

## A. Attorney Fees

■ ¶ 49 "[A]ttorney fees are awardable only if authorized by statute or by contract." *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988). In this instance, attorney fees are provided for by the EMSA.[18] Therefore, the trial court was limited to awarding fees "only in accordance with the terms of the contract." *Id.*

■ ¶ 50 Relying on the EMSA, the trial court limited Moore's recovery of attorney fees to those that were successful and related to the breach of contract action. The Moores argue that because all of the original claims were so closely related, they were entitled to fees for all of their claims regardless of their basis or whether they were successful. The Utah Supreme Court addressed this same issue in *Foote v. Clark,* 962 P.2d 52 (Utah 1998). There, the supreme court reviewed a request for attorney fees based on an identical EMSA provision. *See id.* at 54. The supreme court first made clear that regardless of the provision in the EMSA, the requesting party was required to

> categorize the time and fees expended for (1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement to attorney fees.

*Id.* at 55 (quotations and citation omitted). Because *Foote* is controlling,[19] the Moores' argument that they were not required to categorize their requested fees fails.

¶ 51 The same is true for the Moores' claim that they are entitled to recover fees for claims unrelated to the breach of contract action. The supreme court in *Foote* rejected the argument that the EMSA allowed recovery for fees relating to noncontract claims

---

17. Because of the time constraints in Utah's rule 26(b), we also suggest the trial court specifically consider the time span between the completion of the Moores' experts' reports and the taking of the depositions. *See* Utah R. Civ. P. 26(b)(4)(A). Without ascribing fault, the record indicates at least two years lapsed between the time the Moores' experts completed their expert reports and were subsequently deposed.

18. In relevant part, the EMSA states:

> Both parties agree that should either party default in any of the covenants or agreements herein contained, the defaulting party shall pay all costs and expenses, including a reasonable attorney[ ] fee, which may arise or accrue from enforcing or terminating this Agreement or in pursuing any remedy provided hereunder or by

applicable law, whether such remedy is pursued by filing suit or otherwise.

19. At oral argument, the Moores' attorney directed our attention to *Dejavue, Inc. v. U.S. Energy Corp.,* 1999 UT App 355, 993 P.2d 222, to bolster the argument that they are entitled to all requested attorney fees. We believe, however, that *Dejavue* is distinguishable. The trial court in that case found that claims including contract and tort claims were interrelated legal theories and involved a common core of facts. These findings were not disputed on appeal. Here, the trial court made no such findings and implicitly ruled that the claims were separable. Therefore, *Foote v. Clark,* 962 P.2d 52 (Utah 1998), not *Dejavue,* is controlling case law. We do not address the continued viability of *Dejavue,* as it is not necessary to resolution of this case.

because such claims were "not brought to 'remedy' a default in the purchase agreement.... It would violate the contract to require the defaulting party to pay attorney fees accrued in pursuing these claims when the work done did not tangibly relate to the breach of contract claim as well." *Id.* at 56. In this instance, the Moores brought several claims, only one of which, the breach of contract claim, was to enforce the EMSA. Therefore, the trial court did not err in refusing to award fees for claims other than the breach of contract action.

## B. Reduction in Fees

¶ 52 Next, the Moores take issue with the fact that the trial court awarded a significantly smaller amount of attorney fees than were accrued throughout the course of this litigation and requested by the Moores. Specifically, the Moores argue that "[t]here is no evidence or basis in the findings of fact to support a reduction in attorney[ ] fees from $123,639.64 to $40,000."

¶ 53 "Calculation of reasonable attorney fees is in the sound discretion of the trial court, and will not be overturned in the absence of a showing of a clear abuse of discretion." *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988) (citation omitted). When determining what constitutes a reasonable award of attorney fees, the trial court should consider several factors, some of which include the amount of work actually performed and the amount of work "reasonably necessary to adequately prosecute the matter." *Id.* at 989–90. Although the trial court awarded a significantly smaller amount of fees and costs than was initially requested, it was within its discretion to do so. First, the Moores failed to comply with the requirement that they separate the fees into those related to successful and unsuccessful claims. Second, when given an opportunity to correct the error, the Moores made little effort to do so.

¶ 54 After a hearing on the motion for attorney fees, the trial court ordered the Moores to review their request and "resubmit the attorney fees and costs that were accrued only in pursuing the successful breach of contract claim." When the Moores

resubmitted their request for fees, they "made only minor modifications to the prior request. In the Court's opinion [the Moores] made no real effort to comply with the Court's directive to submit a claim for attorney[ ] fees and costs associated with the successful breach of contract claim." As a result, the trial court was left to "make its own evaluation of the request based upon its knowledge of the case[,] ... evaluation of the claimed fees and costs[,] and the Court's experience and knowledge of attorney[ ] fees in similar cases." The trial court then proceeded to consider several of the factors from *Dixie State Bank,* including the necessity and context of the various motions for summary judgment and the fact that the requested fee was "more than four times the monetary award given the Plaintiff by the jury and [wa]s substantially more than the $83,000.00 total purchase price for the subject house." Although the Utah Supreme Court cautions against basing reasonableness determinations on the amount in controversy or amount actually recovered, *see Dixie State Bank,* 764 P.2d at 990, the trial court was nonetheless entitled to consider these factors in making its reasonableness determination. *See id.* ("[A]lthough the amount in controversy can be a factor in determining a reasonable fee, care should be used in putting much reliance on this factor."). Moreover, in relying on these figures, the trial court expressly recognized that they were not determinative of its overall determination.

¶ 55 Because the trial court based its decision on the factors enumerated in *Dixie State Bank,* its knowledge of the case, experience with similar cases, and the Moores' deficient fee request, we conclude that the trial court did not abuse its discretion in awarding attorney fees.

## C. Rule 54(d)

¶ 56 The Moores also argue that the trial court incorrectly limited recoverable costs to those customarily provided for under rule 54(d) of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 54(d). Rule 54(d)(1) states that "except when express provision therefor is made either in a statute of this state or in these rules, costs shall be allowed

as of course to the prevailing party unless the court otherwise directs...." *Id.* Additionally, the EMSA at issue provides "that the defaulting party shall pay all costs and expenses ... which may arise or accrue from enforcing or terminating this agreement." In *Chase v. Scott*, 2001 UT App 404, 38 P.3d 1001, the Utah Supreme Court interpreted identical language, and held, "In order to not render the term 'costs' superfluous, the Contract should be read to include those costs that were associated with the litigation but would not be included under a regular Rule 54(b) cost award." *Id.* at ¶ 20.

¶ 57 Under *Scott*, the Moores argue that the trial court erroneously limited costs to those traditionally awarded under rule 54(d). However, Moore's argument fails because the trial court based its award on the fact that "[t]here was no attempt by Plaintiff to allocate which costs, especially the expert witness fees, ... should be attributed to the breach of contract claims for which recovery was awarded by the jury." Moreover, although the court awarded such costs that were normally "awarded to a prevailing party pursuant to Rule 54," it also awarded "any other costs or expense associated with the breach of contract claim."

## D. Reduction in Costs

¶ 58 Regarding the Moores' final claim that the trial court arbitrarily reduced the awardable costs to $10,000, we find no abuse of discretion. As with the trial court's attorney fees determination, the trial court relied on "its knowledge of the case[,] ... evaluation of the claimed fees and costs[,] and the Court's experience and knowledge of ... similar cases." Therefore, we are not persuaded by the Moores' argument, especially considering the fact that they had an obligation to indicate which costs fell within the terms of the contract and they failed to comply with that requirement.

## CONCLUSION

¶ 59 We affirm the trial court's application of the discovery rule and its refusal to dismiss all of the Moores' fraudulent nondisclosure claims on summary judgment. We do not reach the Smiths' claims regarding the statute of limitations and the special verdict form because neither argument was preserved for appeal.

¶ 60 Regarding the Moores' cross-appeal, we first reverse the trial court's conclusion that caveat emptor applied and absolved the Smiths of a duty to disclose material information to the Moores. Moreover, we conclude that based on Mr. Smith's status as a builder-seller, the Smiths had a duty to disclose material information. Therefore, we remand for a determination of materiality and knowledge. Second, we reverse the trial court's application of the merger doctrine to the Moores' negligent misrepresentation claims and remand on those issues. Third, we reverse the trial court's determination that an expert's time spent preparing for depositions is not compensable and remand for a determination of reasonableness. And finally, we affirm the trial court's determinations regarding attorney fees and costs.

¶ 61 Both parties have succeeded to some extent on appeal. We therefore decline to award attorney fees on appeal and order each party to pay its own costs incurred on appeal.

¶ 62 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.