2010 UT App 361

**GILBERT DEVELOPMENT CORPORATION, Plaintiff and Appellant,**

v.

**WARDLEY CORPORATION, Don Grymes, Terry LoCicero, Lloyd Melling, Chad Riddle, et al., Defendants and Appellees.**

No. 20090358–CA.

Court of Appeals of Utah.

Dec. 16, 2010.

132

Bryan J. Pattison, St. George; and Thomas J. Burns, David J. Jordan, and David J. Williams, Salt Lake City, for Appellant.

Matthew L. Lalli, James D. Gardner, and Troy L. Booher, Salt Lake City, for Appellees.

Before Judges McHUGH, ORME, and VOROS.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Gilbert Development Corporation (GDC) appeals from the entry of a directed verdict and the accompanying award of attorney fees in favor of Defendants Wardley Corporation (Wardley) and Wardley employees Don Grymes, Terry LoCicero, Lloyd Melling, and Chad Riddle (collectively, the Wardley employees). We affirm both the trial court's entry of a directed verdict in favor of Defendants and its determination that Defendants are entitled to their reasonable attorney fees, but we remand for a recalculation of the amount of attorney fees awarded.

## BACKGROUND [1]

¶ 2 The dispute arises from a real estate transaction in which GDC was the seller; LoCicero and another Wardley employee,

---

1. "In reviewing the district court's grant of a directed verdict, we review the facts in the light most favorable to the losing party." *Garrard v. Gateway Fin. Servs., Inc.*, 2009 UT 22, ¶ 2, 207 P.3d 1227. Because we ultimately resolve this matter on the basis of harmless error, however, we discuss evidence presented in support of the jury's verdict later in this decision.

Karen Fuller,[2] were the seller's agents; Melling and Riddle were the buyer's agents; and Grymes was the broker responsible for both the buyer's and the seller's agents. Steve Gilbert (Gilbert) is the president and majority owner of GDC.

### Gilbert's Prior Dealings with Dave Wright

¶3 In the early 1990s, GDC acquired Zion View Estates (Zion View), a seventy-five acre parcel of property in La Verkin, Utah, with the intention of developing it. GDC entered into an agreement with Dave Wright to install manufactured homes at Zion View, but it eventually terminated the agreement because Wright installed several homes that GDC had expressly rejected and because some of the homes installed had serious structural problems. That experience led Gilbert to conclude that Wright was an "[un-]truthful" and "untrustworthy" person with whom Gilbert did not wish to do business in the future.

¶4 After terminating the agreement with Wright, GDC decided to sell the remaining property rather than continue with development plans. To that end, GDC retained Fuller and LoCicero to list and sell Zion View. On July 21, 1999, GDC and Wardley formalized that relationship by executing a listing agreement for the Zion View property (the Listing Agreement). The Listing Agreement sets forth the duties of the agents and the broker, including how those duties would be affected if other Wardley agents were to represent the buyer in the transaction.

¶5 Gilbert and Fuller testified that Gilbert clearly indicated when he signed the Listing Agreement that he would not consider seller financing of the Zion View transaction if Wright were involved. According to Fuller, Gilbert "did not want to have any kind of a connection with Mr. Wright in a financial way or a business way at all." Gilbert testi-

fied that he told Fuller and LoCicero that he had previously been "disappointed" by Wright's conduct and that, therefore, "he did not want to have anything to do with ... Wright."

### REPC–1, a Cash–at–Closing Transaction

¶6 After GDC rejected an initial offer from a manufactured housing company named Mobile Mansions, LoCicero and Fuller informed GDC that an individual named Henry Butterfield had retained Melling and Riddle to represent him in purchasing Zion View. Gilbert, acting on behalf of GDC, entered into a real estate purchase contract (REPC–1) with Butterfield, wherein GDC agreed to convey Zion View to Butterfield in exchange for $1.2 million, with a $100,000 nonrefundable deposit due immediately and the remainder of the purchase price to be paid at closing. During the negotiations with respect to REPC–1, Gilbert dealt only with his agents, Fuller and LoCicero; therefore, Gilbert had never met Butterfield and was unaware that he owned Mobile Mansions.[3]

¶7 Also unknown to Gilbert and the GDC agents, Fuller and LoCicero, was the fact that for much of the negotiations, Butterfield's agents, Melling and Riddle, had been dealing exclusively with Wright, who was acting as Mobile Mansions and Butterfield's representative with respect to REPC–1.[4] Indeed, Melling and Riddle were first contacted about the Zion View listing by Wright, spoke with Wright on the phone more than thirty times, and frequently met with him in person at either Wright's or Wardley's offices.

¶8 The November 1, 1999 closing date set forth in REPC–1 was extended until the end of November 1999 to allow Butterfield additional time to obtain the necessary financing. When the sale failed to close by the extended deadline, Gilbert and Butterfield each demanded the $100,000 earnest money deposit.[5]

---

2. GDC did not pursue a claim against Fuller.

3. Fuller and LoCicero were also unaware that Butterfield was the owner of Mobile Mansions.

4. During litigation, counsel for Butterfield testified that Wright was working as an independent contractor for Mobile Mansions, with responsi-

bilities for "the day-to-day ... management" of the company.

5. GDC asserts that attorney Bruce Jenkins filed a "claim[] that Mobile Mansions—not GDC or Butterfield—was entitled to the ... deposit," because the checks were drawn on Mobile Mansions' rather than Butterfield's account. We

For the stated purpose of resolving that dispute, Wardley sent written notice to the parties indicating that it intended to arbitrate the matter at a December 13, 1999 meeting (the arbitration) [6] among Gilbert; Gilbert's agents, Fuller and LoCicero; Butterfield's lawyer, Bruce Jenkins; Butterfield's agents, Melling and Riddle; and the broker, Grymes.

*REPC–2, a Seller–Financed Transaction*

¶ 9 After Gilbert agreed at the arbitration to discuss a new deal, Grymes raised the possibility of seller financing. Gilbert testified that he informed Grymes that he had no interest in seller financing or any other deal if Wright was involved. According to Gilbert, Grymes assured him that no one other than Butterfield "was involved in th[e] transaction," and Melling and Riddle, who were present, did not comment on Wright's earlier participation in reviewing documents and serving as Butterfield's liaison with respect to REPC–1, the cash transaction. Gilbert testified that, upon receiving reassurance from Grymes that Wright was not involved, he signed a second real estate purchase contract (REPC–2), wherein GDC agreed to convey Zion View to Butterfield for a total of $1.6 million to be paid as follows: (1) GDC would immediately receive the $100,000 deposit that Butterfield had already paid toward REPC–1; (2) Butterfield would tender an additional $400,000 at the time of closing; and (3) GDC would seller-finance the remaining $1.1 million.

¶ 10 A few weeks after signing REPC–2, Gilbert heard a rumor that Wright was showing Zion View lots to prospective home buyers. Gilbert called his agents, Fuller and LoCicero, to inform them of the rumor and again "made it clear . . . that if . . . Wright's involved, th[e] deal's off." Fuller and LoCicero said they had not heard anything

about Wright being involved but would "check into" the rumor. Fuller testified that she first contacted the buyer's agents, Melling and Riddle, who responded that Fuller "couldn't prove that . . . Wright was involved, and [that Fuller] didn't have any evidence except what [Gilbert] had said." Unable to obtain any additional information from Melling and Riddle, Fuller next went to her broker, Grymes. Fuller testified that Grymes told her that "it would probably be in [her] best interest not to pursue [the matter] because [she] couldn't prove" that Wright was involved in REPC–2. When Fuller could not find any other evidence of Wright's involvement, she stopped pursuing the matter, and neither she nor LoCicero followed up with Gilbert regarding Wright's rumored involvement.

¶ 11 Despite his concerns, Gilbert did not make any independent investigation into Wright's involvement. Likewise, Gilbert did not perform any due diligence concerning Butterfield's credit-worthiness. For example, Gilbert did not request Butterfield's financial statements or other information relative to Butterfield's ability to repay the $1.1 million Gilbert had seller-financed. Instead, Gilbert reasoned that the $500,000 down payment under REPC–2 was "[p]retty good insurance," because "if Butterfield's a deadbeat and defaults, [Gilbert would] get to keep the money . . . and repossess the property." The parties closed the sale as reflected in REPC–2 on January 13, 2000, with Wardley receiving $96,000 from the proceeds at closing. That amount was split six ways, first by the payment of a franchise fee to Better Homes & Gardens, and then as commission among Wardley, Fuller, LoCicero, Melling, and Riddle.

cannot determine whether that is correct because the trial exhibits, including those GDC references in support of its assertion, are not included in the record on appeal. *See generally* Utah R.App. P. 11(c)–(e) (discussing appellant's burden to ensure that the record on appeal is complete); *State Eng'r v. Shepherd (In re General Determination of Rights to Use of Water)*, 2005 UT App 450, ¶ 15, 128 P.3d 6 (Orme, J., concurring) ("When crucial matters are not included in the record, the missing portions are presumed to

support the action of the trial court." (internal quotation marks omitted)).

6. Although not an arbitration in the more formal sense, we refer to the December 13, 1999 meeting as "the arbitration" because it was characterized as such by Wardley in the written notice to the parties and was consistently identified as "the arbitration" by the witnesses at trial and in the parties' written submissions both in the trial court and on appeal.

¶ 12 In addition to the $500,000 down payment, Butterfield paid $138,606.05 to GDC during the year after closing. However, in the first part of 2001, Butterfield's payments stopped. Around that same time, Gilbert received a telephone message from Wright regarding the payments, to which Gilbert did not respond. Instead, on March 19, 2001, Gilbert sent a letter to Butterfield, demanding payment on the account and stating that although Gilbert had "receive[d] a telephone call from Mr. Dave Wright, alleging to be negotiating on [Butterfield's] behalf," Gilbert had "no agreements or business dealings with Mr. Wright."

¶ 13 When Butterfield failed to bring the account current, GDC initiated foreclosure proceedings. Those proceedings were significantly delayed when Butterfield and Mobile Mansions filed for bankruptcy in California and the bankruptcy trustee sued GDC for recoupment of almost one million dollars.[7] GDC retained California counsel and, after incurring almost $600,000 in attorney fees over approximately two years of litigation, was successful in having the trustee's claims dismissed. Only then was GDC able to complete the Utah foreclosure proceedings and to resell Zion View. In doing so, GDC incurred approximately $158,000 in expenses to bring the property taxes current and to return the property to marketable condition.[8] Eventually, GDC sold the remaining Zion View lots for approximately $1.6 million.[9]

¶ 14 On April 10, 2003, GDC filed this lawsuit against Defendants asserting claims for, among other things, fraudulent nondisclosure, breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty.[10] GDC sought a total of more than six million dollars in damages, which includes the costs GDC incurred defending against the bankruptcy action, foreclosing on Zion View, paying property taxes, maintaining Zion View, and returning the property to marketable condition. Following a seven-day jury trial, the defense moved for a directed verdict. The trial court granted the motion with respect to fraudulent nondisclosure but found that there was sufficient evidence to go to the jury on the remaining claims. The jury returned a verdict resulting in judgment in favor of Defendants on all of the claims tried. Pursuant to the Listing Agreement's attorney fees provision, the trial court also awarded Defendants $397,911 in attorney fees and $12,912.89 in costs.

## ISSUES AND STANDARDS OF REVIEW

¶ 15 GDC first challenges the propriety of the trial court's entry of a directed verdict in favor of Defendants on the fraudulent nondisclosure claim. A directed verdict "motion can be granted only when the moving party is entitled to judgment as a matter of law." *Moore v. Smith*, 2007 UT App 101, ¶ 18, 158 P.3d 562 (internal quotation marks omitted). "Where there is any evidence that raises a question of material fact, no matter how improbable the evidence may appear, judgment as a matter of law is improper." *Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶ 20, 182 P.3d 911 (internal quotation marks omitted). Accordingly, "[w]e review a trial court's grant of directed verdict for correctness," and "will sustain a directed verdict if[,] after examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 19, 221 P.3d 205 (internal quotation marks omitted). However, we will not reverse a decision granting directed verdict if the outcome would have been the same even if the matter had been submitted to the jury. *See Steffensen v. Smith's Mgmt. Corp.*, 820

---

7. The trustee handled the bankruptcy cases for both Butterfield and Mobile Mansions.

8. Although GDC introduced evidence of these expenses at trial, those exhibits are not included in the record on appeal and the only other record evidence of the expenses is Gilbert's testimony that he paid $108,439.69 in property taxes and $50,000 to restore the property.

9. The exhibits showing the exact sale price also are not included in the record, but Gilbert testified that Zion View sold for "more than 1.6 million dollars" after foreclosure.

10. The remaining claims were either dismissed by GDC before trial or are not relevant on appeal.

P.2d 482, 490 (Utah Ct.App.1991) (holding that the trial court's erroneous partial directed verdict was harmless where the jury found that the defendant's negligence was not the proximate cause of the plaintiff's injuries), *aff'd*, 862 P.2d 1342 (Utah 1993).

¶ 16 GDC next claims both that the attorney fees award should be reversed and that the trial court erred in calculating the amount of attorney fees awarded to Defendants. " 'Calculation of reasonable attorney fees is in the sound discretion of the trial court, and will not be overturned in the absence of a showing of a clear abuse of discretion,' " *Moore*, 2007 UT App 101, ¶ 53, 158 P.3d 562 (quoting *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988)), while the question of "[w]hether a party is entitled to an award of attorney fees is a legal conclusion ... which we review for correctness," *IHC Health Servs. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 38, 196 P.3d 588; *see also Meadowbrook, LLC v. Flower*, 959 P.2d 115, 116 (Utah 1998) ("We review a trial court's conclusions of law [regarding attorney fees] for correctness, granting no deference to the trial judge's legal determinations.").

## ANALYSIS

### I. Harmless Error

¶ 17 We first consider Defendants' contention that the judgment on the claims that were submitted to the jury renders harmless any error in directing verdict in favor of Defendants on the fraudulent nondisclosure claim. If Defendants are correct, we need not determine whether the trial court, in fact, erred because even if the fraudulent nondisclosure claim had been presented to the jury, the result would have been the same. *Cf. Jenkins v. Weis*, 868 P.2d 1374, 1376 (Utah Ct.App.1994) (holding that even if the trial court erroneously determined that the plaintiff was a public figure, the error was harmless because the jury's finding that the statements made by the defendant were true was a complete defense to defamation); *Steffensen*, 820 P.2d at 490 (holding that the jury's finding that the defendant's negligence was not the proximate cause of the plaintiff's injuries rendered any error in granting directed verdict harmless). Consequently, our determination of whether the trial court erred in directing verdict on GDC's fraudulent nondisclosure claim would be unnecessary. *Cf. Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 137, 82 P.3d 1076 (holding that the issue of whether the trial court erred in dismissing the plaintiff's claim that the defendant physician had fraudulently concealed his malpractice was moot due to the jury's finding that the physician was not negligent).

¶ 18 After the trial court entered a directed verdict on the fraudulent nondisclosure claim, it met with the parties to discuss the verdict form to be used in the trial of the remaining claims. The parties eventually stipulated to a special verdict form, which asked, as the first question (question one),

Do you find by a preponderance of evidence that [GDC] imposed, under the terms of any agreement, in sufficiently definite terms a condition that GDC would not seller-finance the sale of [Zion View] to anyone if ... Wright or a manufactured housing company were involved in the transaction in any way, shape or form?

The special verdict form then instructed the jury to sign and return the form without answering any other questions, if it answered "no" to question one.

¶ 19 Upon receipt of the completed special verdict form with the jury's negative response to question one, the trial court entered judgment against GDC on all claims, including GDC's claim for breach of fiduciary duty. GDC did not object to the special verdict form or the entry of judgment in the trial court and has not challenged either on appeal. Instead, GDC's appeal is limited to its claim that the trial court erred by directing verdict on its claim for fraudulent nondisclosure. Although we agree with the trial court that the evidence on this claim was thin, we need not undertake an analysis of whether it was enough to allow GDC to present the claim to the jury because, even assuming the directed verdict was erroneous, the judgment against GDC on its fiduciary duty claim rendered any error harmless. *Cf. Clayton v. Ford Motor Co.*, 2009 UT App 154, ¶ 39, 214 P.3d 865 (holding that directed verdict on fraud claim, even if erroneous, was

harmless where jury found that motor vehicle was not defective and the fraud claim was based on the defendant's knowledge of the defects); *Steffensen*, 820 P.2d at 490 (holding that erroneous partial directed verdict was harmless where jury found that the plaintiff's injuries were not proximately caused by the defendant's negligence).

■■ ¶ 20 The elements of breach of fiduciary duty based upon the failure to disclose material information, each of which must be proven by a preponderance of the evidence, are (1) a fiduciary duty to disclose material information, (2) knowledge of the information, and (3) failure to disclose the information. *See Hermansen v. Tasulis*, 2002 UT 52, ¶¶ 18–22, 48 P.3d 235. To prevail on a claim of fraudulent nondisclosure, GDC must also establish, but by clear and convincing evidence, (1) a legal duty to disclose, (2) knowledge of the material information, and (3) a failure to disclose. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 10, 143 P.3d 283 (discussing the elements of fraudulent nondisclosure); *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶¶ 12 n. 10, 16, 233 P.3d 538 (requiring fraud claims to be proven by clear and convincing evidence), *cert. granted*, 238 P.3d 443 (Utah 2010). Defendants reason that where a verdict has been entered against GDC on its breach of fiduciary duty claim, its claim for fraudulent nondisclosure based on proving the same elements at a higher standard of proof must also—and necessarily—fail.[11] Under the facts of this case, we agree.

A. In the Absence of GDC's Condition, the Wardley Employees Had No Duty to Disclose Wright's Business Association with Butterfield.

■ ¶ 21 Both GDC's claim of fraudulent nondisclosure and its claim of breach of fiduciary duty are premised on the failure of the Wardley employees to disclose Wright's business relationship with Butterfield. Thus, each claim required GDC to prove "a legal

duty to communicate" that information. *See Hermansen*, 2002 UT 52, ¶¶ 18–26, 48 P.3d 235 (discussing breach of fiduciary duty and fraudulent nondisclosure); *Moore v. Smith*, 2007 UT App 101, ¶ 33, 158 P.3d 562 (discussing fraudulent nondisclosure). "[N]ondisclosure becomes fraudulent only when there is an existing fact or condition ... which the party charged is under a duty to disclose." *Jensen*, 2003 UT 51, ¶ 34, 82 P.3d 1076 (omission in original) (emphasis and internal quotation marks omitted). Whether a duty exists "is a purely legal question," *Yazd*, 2006 UT 47, ¶ 14, 143 P.3d 283, which courts analyze by examining "the structure and dynamics of the relationship between the parties," including their "legal relationships" and "the duties created by [those] relationships," *id.* ¶ 15 (internal quotation marks omitted). "A person who possesses important, even vital, information of interest to another has no legal duty to communicate the information where no relationship between the parties exists." *Id.* ¶ 17. The relationships between the parties and the duties of the individual Defendants are prescribed by the Listing Agreement; by the section of the Utah Administrative Code applicable to real estate professionals, *see* Utah Admin. Code R162–6; and by prior appellate authority, *see, e.g., Hermansen*, 2002 UT 52, ¶¶ 18–23, 48 P.3d 235. Although those legal duties vary, each Wardley employee was required to disclose material information under certain circumstances.

¶ 22 As GDC's own real estate agent, LoCicero had an affirmative duty to disclose any known material facts to GDC. The Listing Agreement states that, as the seller's agent, LoCicero had "fiduciary duties to [GDC] which include loyalty, full disclosure, confidentiality, diligence, obedience, [and] reasonable care." The Utah Administrative Code similarly states that a seller's agent "owe[s] the seller ... the ... fiduciary dut[y of] ... [f]ull disclosure, which obligates the agent to tell the seller ... all material infor-

---

11. While we agree that the failure to establish the existence of a duty to disclose is fatal to both causes of action, we note that a claim of fraudulent nondisclosure is not limited to situations in which the real estate agent owes a fiduciary duty to the plaintiff. *See Hermansen v. Tasulis*, 2002

UT 52, ¶ 22, 48 P.3d 235 ("[T]hough not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent....").

mation which the agent learns about the buyer or ... about the transaction." Utah Admin. Code R162–6–2.15.1(c); *see also Hopkins v. Wardley Corp.*, 611 P.2d 1204, 1206 (Utah 1980) (stating that a real estate agent owes to his or her principal "a fiduciary duty of full disclosure of facts material to [the] principal's business"). By regulation, a seller's agent, such as LoCicero, also owes a duty of obedience to the seller, "which obligates the agent to obey all lawful instructions from the seller." Utah Admin. Code R162–6–2.15.1(b).

¶ 23 As the broker for both GDC and Butterfield, Grymes was a "limited agent." *See generally id.* R162–6–2.15.3. Because of the possible conflicts between buyer and seller, a limited agent does not have fiduciary duties with respect to full disclosure. *See, e.g., id.* R162–6–2.15.3.1(a) (stating that a broker should explain that the buyer and seller may not demand the broker's "undivided loyalty" and that, "[i]n the event of conflicting interests, the [broker or limited] agent will be held to the standard of neutrality"); *id.* R162–6–2.15.3.1(b) (stating that a limited agent may not disclose confidential information that would weaken the other party's bargaining position). Rather, the Utah Administrative Code states that a limited agent is "required to disclose information given to the agent in confidence ... if failure to disclose the information would be a material misrepresentation regarding the property or regarding the abilities of the parties to fulfill their obligations." *Id.* R162–6–2.15.3.1(c). The Listing Agreement also requires Grymes to disclose material information if the failure to disclose would be a material misrepresentation. In addition, the Listing Agreement provides that, "regardless of whom the agent represents, the agent owes a duty of honesty and fair dealing to all parties to the transaction."

¶ 24 Melling and Riddle, as the buyer's agents, owed lesser duties to GDC because Melling and Riddle's primary duties, including fiduciary duties of full disclosure and confidentiality, were owed to Butterfield, *see id.* R162–6–2.15.2. However, Melling and Riddle could not "misrepresent, either affirmatively or by omission, the buyer's ... financial condition or ability to perform." *Id.* R162–6–2.15.2(d); *see also Hermansen,* 2002 UT 52, ¶¶ 20, 22, 48 P.3d 235 (holding that a seller's real estate agent must "be honest, ethical, and competent" in dealing with the buyer so that the buyer has "sufficient accurate information to make an informed decision" about whether to proceed with the transaction (internal quotation marks omitted)).[12]

¶ 25 The trial court instructed the jury on the duties each real estate agent owed to GDC, including the circumstances under which each had a duty to disclose information. For any of the Wardley employees, a prerequisite to any duty to disclose is that the information known to the employee be material. *See* Utah Admin. Code R162–6–2.15.1(c) (seller's agent); *id.* R162–6–2.15.3.1(c) (limited agent); *id.* R162–6–2.15.2(d) (buyer's agent). Here, GDC asserts that Wright's tangential involvement was material both objectively and because the Wardley employees were aware that GDC had conditioned its agreement on seller financing of the transaction on Wright having no involvement in any way, shape, or form. GDC further contends that the jury could have found such a condition either due to an agreement between the parties or due to GDC's unilateral declaration of the condition. We address each of these bases for proving the materiality of Wright's tangential involvement in turn.

¶ 26 We begin our analysis by rejecting GDC's argument that "materiality" is measured in "but for" terms, which are satisfied by a determination that but for Defendants' failure to disclose Wright's involvement, GDC would not have entered into

---

**12.** Defendants assert that the duties listed in *Hermansen v. Tasulis,* 2002 UT 52, 48 P.3d 235, do not apply to Melling and Riddle because *Hermansen* addressed the duties a seller's agent owes to a buyer with respect to the disclosure of defects in the property, *see id.* ¶¶ 18–20. However, the supreme court did not limit its analysis to the duties of a seller's agent, but addressed the duties of "licenced real estate professionals," *id.* ¶ 18, and "licensed real estate agent[s]" generally, *id.* ¶ 21. Further, we can think of no reason why such duties would be limited to property defect cases, as opposed to other subsets of fraud.

REPC–2. *See generally Gohler v. Wood,* 919 P.2d 561, 564–65 (Utah 1996) (rejecting subjective elements of materiality standard in the securities fraud context); 37 Am.Jur.2d *Fraud and Deceit* § 236 (2001) (contrasting materiality standards in states adopting a subjective "but for" test and states, like Utah, that have adopted an objective "reasonable person" standard). Instead, we agree with Defendants that "materiality" is an objective term and is defined as "something which a buyer or seller of ordinary intelligence and prudence would think to be of . . . importance in determining whether to buy or sell." *Yazd v. Woodside Homes Corp.,* 2006 UT 47, ¶ 32, 143 P.3d 283. "Importance . . . can be gauged by the degree to which the information could be expected to influence the judgment of a person buying property or assenting to a particular purchase price." *Id.* ¶ 34. Under that standard, the information regarding Wright's involvement in the transaction would be material only if it would influence the judgment of a seller of ordinary intelligence and prudence. *See id.* ¶¶ 32, 34.

1. Wright's Involvement Is Not Objectively Material.

█ ¶ 27 Applying that definition of "materiality," we limit our review to the issue of Wright's involvement with respect to REPC–2. Gilbert stated unequivocally that the condition concerning Wright applied only in a seller-financed transaction. REPC–1 required the buyer to pay the entire purchase price at closing; it was a cash transaction. Thus, any condition unilaterally imposed by Gilbert was inapplicable to REPC–1. Indeed, Gilbert admitted that GDC "would have sold [Zion View] to . . . Wright in a cash transaction" like REPC–1.[13]

¶ 28 Although REPC–2 was seller-financed, it required a nonrefundable down payment of $500,000. Furthermore, the seller-financed portion of the purchase price was secured by Zion View as reflected in a trust deed. Only Butterfield was obligated on the promissory note to GDC, and at the time

REPC–2 was signed, Butterfield had significant assets. Under these circumstances, we agree with Defendants that Wright's involvement in some way other than as a party to REPC–2 would be immaterial to a seller of ordinary intelligence or prudence, as a matter of law. *Cf. id.* ¶ 34 (remanding for a determination of whether information was material where "a finder of fact could reasonably find" that the "information could be expected to influence the judgment of a person buying property or assenting to a particular purchase price").

2. If GDC Communicated Its Condition to the Wardley Employees, Information About Wright's Involvement Is Assumed Material.

¶ 29 Despite the absence of objective materiality, Gilbert argues that he could unilaterally impose a duty to disclose on Defendants by clearly communicating to them that Wright's involvement with REPC–2 in any way, shape, or form was subjectively material to him. This materiality standard is consistent with the approach set forth in the Restatement (Second) of Torts, which states that

> [a] person . . . is required to disclose only those matters that he has reason to know will be regarded by the other as important in determining his course of action in the transaction at hand. He is therefore under no duty to disclose matter that the ordinary man would regard as unimportant *unless he knows of some peculiarity.*

Restatement (Second) of Torts § 551 cmt. c (1976) (emphasis added); *see also id.* § 538 (stating that in the context of fraudulent misrepresentation, a fact is material where either "a reasonable man would attach importance to its existence or nonexistence" or the defendant "knows or has reason to know" that the other party "regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it"). Utah's appellate courts have not ruled on whether this exception to an objective definition of

---

**13.** Further, because REPC–1 failed to close, Wright's participation in that transaction cannot have caused the damages GDC alleges it sus-

tained as a result of Butterfield's breach of REPC–2.

materiality is applicable in this state. For purposes of our analysis, we assume without deciding that Utah would follow the Restatement definition of materiality, which includes an objectively immaterial fact if the defendant knows that the other party regards it as important. *See id.* § 538.

¶ 30 Nevertheless, Defendants argue that this subjective definition of materiality is factually irrelevant to this case for two reasons. First, they contend that GDC did not actually consider the identity of the buyer material due to the favorable terms of REPC–2. Defendants note that Gilbert engaged in no due diligence concerning Butterfield's ability to repay GDC and admitted that he was relying on the large downpayment and the right to repossess the property instead. Indeed, Gilbert testified that he thought the $500,000 deposit was "[p]retty good insurance" and decided it was unnecessary to do any further research regarding Butterfield's financial condition. Based on that testimony, the Defendants reason that it would have been irrelevant to Gilbert who bought the property, even if that buyer had been Wright, so long as the terms of REPC–2 remained the same. However, Gilbert also testified that his animosity toward Wright elevated Wright's involvement to a subjectively material fact that would have been determinative of whether GDC entered into the transaction. The jury was free to believe that Wright's association with Butterfield was that important to GDC, whether objectively material or not.

¶ 31 Second, Defendants assert that Gilbert never clarified what he meant by his condition that Wright not be "involved" in the transaction and that any objective interpretation would mean that Wright could not be an undisclosed buyer. Defendants maintain that this meaning was the one advanced by GDC until Gilbert conceded at trial that Butterfield, not Wright, was the only person obligated as the buyer under the terms of REPC–2. We agree that GDC's theory evolved at trial. During its opening statement, GDC told the jury that Defendants had violated their duties by not disclosing that Wright was the real buyer and instead "assist[ing] Mr. Wright in putting up a straw buyer for [Zion View]," while Wright was "involved, and in essence the real buyer[ ]."

By closing argument, GDC's position had changed so that Gilbert's condition was explained to the jury as "Gilbert would not seller[-]finance to any buyer if Dave Wright . . . was involved in [REPC–2] . . . [in a]ny way, any shape or any form."

¶ 32 However, GDC did argue—even if belatedly—that Gilbert conditioned his agreement to finance the transaction on Wright having no involvement whatsoever. If the jury found that GDC imposed such a condition, the Restatement definition could render the information about Wright's involvement material, thereby supporting a determination that the Wardley employees had a legal duty to disclose it. In contrast, absent evidence of a clear communication of the condition, the unusual extent of Gilbert's concerns about Wright would be immaterial, even under the Restatement definition, and would not create a duty to disclose. Because a duty to disclose is a required element of both breach of fiduciary duty based on nondisclosure and of fraudulent nondisclosure, a finding that GDC's participation was not conditioned on Wright having no involvement with REPC–2 whatsoever is fatal to both claims.

B. GDC Did Not Impose a Condition that Wright Could Not Be Involved.

¶ 33 GDC concedes that the jury's answer to question one defeats any argument that a condition that Wright could not be involved in any way, shape, or form, was imposed under the terms of any agreement. Nevertheless, GDC contends that the jury's negative response to question one does not dispose of all possible instances in which the condition could have been imposed, thereby creating a duty to disclose information about Wright's involvement. *See generally Snow v. Rudd,* 2000 UT 20, ¶ 15, 998 P.2d 262 (holding that the jury's finding by special verdict that the plaintiff did not become "fully aware of all facts necessary to show" that she had a claim within the limitations period was not determinative of whether the plaintiff could have discovered her claim earlier "through reasonable investigation"). GDC notes that question one was designed, at Defendants' request, to determine whether

GDC had proved "the first element of a contract claim," that is, whether GDC imposed a condition under "any agreement." While the jury's negative response also defeats a fraudulent nondisclosure claim based upon a condition imposed by agreement, GDC contends that it does not foreclose the possibility that Gilbert unilaterally—rather than by agreement—imposed a sufficiently definite condition that Wright could not be involved in REPC–2 in any way whatsoever. According to GDC, that unilateral condition imposed a duty to disclose on the Wardley employees that could support GDC's fraudulent nondisclosure claim. While we agree that question one is limited to conditions imposed by agreement, we conclude that GDC cannot now seek a more nuanced rationale than the one reflected in the finding it obtained from the jury, which heard all of the evidence presented on that factual question.

1. Because GDC Did Not Timely Object to the Special Verdict Form, Findings in Accordance with the Judgment Are Presumed.

¶ 34 In stipulating to the special verdict form, the parties assumed that unless the jury found that GDC imposed a sufficiently definite condition regarding Wright's involvement under the terms of any agreement, there was no legal duty to speak and judgment against GDC on its claim of breach of fiduciary duty was appropriate as to each Defendant. GDC now asserts, for purposes of its fraudulent nondisclosure claim, that this assumption was faulty because a duty to disclose could have been established by Gilbert's statements irrespective of whether the Wardley employees agreed to the condition. Even assuming, without deciding, that GDC is correct, the attack on the special verdict comes too late. GDC could have requested a special verdict question on this alleged unilaterally imposed condition yet failed to do so.

¶ 35 Rule 49 of the Utah Rules of Civil Procedure provides,

Special Verdicts. The court may ... submit to the jury written interrogatories susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.... *If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue* so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it *shall be deemed to have made a finding in accord with the judgment on the special verdict.*

Utah R. Civ. P. 49 (emphases added). The special verdict stipulated to by the parties did not ask the jury whether GDC imposed a condition, other than by agreement, that Wright could not be involved even tangentially with REPC–2. Furthermore, counsel for GDC did not demand that this question be submitted to the jury before it retired. Consequently, GDC waived the right to a trial by jury of this issue. *See generally Ute–Cal Land Dev. Corp. v. Sather*, 605 P.2d 1240, 1246 (Utah 1980) ("Although the issue of interest was ostensibly raised by the pleadings the defendant did not voice his claim until after the jury was dismissed. Under [r]ule 49(a), the defendant, therefore, waived the jury's consideration of this specific issue...."); *Lignell v. Berg*, 593 P.2d 800, 809 (Utah 1979) (holding that where a special verdict does not ask the jury to determine the date upon which payment was due for purposes of calculating interest, rule 49 provides that a litigant "waives his right to trial of that issue by jury, and the court may make a finding consistent with the jury verdict"). Because GDC also did not request that the trial court make a finding on this factual issue, the finding is deemed to have been made "in accord with the judgment on the special verdict." Utah R. Civ. P. 49(a).

¶ 36 Here, the judgment entered on the special verdict was in favor of Defendants on all claims, including breach of fiduciary duty. Thus, pursuant to rule 49, the trial court is deemed to have found against GDC on the facts raised by the evidence regarding that

claim. *Cf. Golden Key Realty, Inc. v. Mantas,* 699 P.2d 730, 733 (Utah 1985) ("[T]he jury's finding of an accord and satisfaction necessarily must be deemed to have also found the existence of a bona fide dispute, the settlement of which constituted a valid consideration."). Although the jury was never asked whether GDC had imposed a condition with respect to Wright's involvement other than by agreement, the issue was raised by the evidence and a finding that the condition was not unilaterally imposed is presumed from the entry of judgment against GDC on the breach of fiduciary duty claim based on the jury's answer to question one.

¶ 37 Because GDC does not challenge the jury instructions, we assume that the jury was correctly instructed on the elements of breach of fiduciary duty. *See id.* ("Since it does not appear that the plaintiffs objected to the jury instructions, we presume that the jury was correctly instructed."). While the breach of contract instructions refer to a condition imposed by agreement, there is nothing in the jury instructions that limits a legal duty to disclose to conditions imposed by agreement. Thus, the jury could have found that Gilbert's alleged condition, whether or not based upon agreement, created fiduciary duties to disclose Wright's involvement.[14] Yet GDC did not ask the jury to decide this question or seek a finding on it from the trial court. Instead, GDC acquiesced in the entry of judgment on both its contract and fiduciary duty claims based upon the assumption that by answering "no" to question one, the jury found that the information about Wright was not material and that, therefore, the Wardley employees had no legal duty to disclose it.[15] Thus, any finding on the question of whether GDC unilaterally imposed a condition about Wright is deemed to have been made in accord with the entry of judgment and against GDC, *see* Utah R. Civ. P. 49, if such a finding can be supported by the evidence. *Cf. Cheves v. Williams,* 1999 UT 86, ¶ 32, 993 P.2d 191

(holding that where the defendant did not include a special verdict question asking the jury to fix the date upon which the statute of limitations began running, and there was evidence to support a commencement date within the limitations period, the appellate court would presume the accuracy of the jury's verdict that the claim was not barred); *Lignell,* 593 P.2d at 809 (holding that where a special verdict did not ask the jury to determine when the amount owed became due for purposes of calculating interest, "[t]he *real* question with regard to the interest component of the judgment [was] whether the due date found by the [trial] court [under rule 49 was] consistent with the evidence" (emphasis added)).

2. The Evidence Supports a Finding that GDC Did Not Impose a Unilateral Condition that Wright Could Not Be Involved in Any Way, Shape, or Form.

¶ 38 There was evidence presented from which the jury could have found that GDC did not communicate a condition that it would not provide seller financing if Wright were even tangentially involved. While Gilbert and Fuller testified that Gilbert told the Wardley employees that any seller-financed transaction was conditioned on Wright not being involved, the other witnesses contradicted that testimony. LoCicero testified that Gilbert did not impose any conditions about Wright during their meetings and that prior to the lawsuit she had never heard that GDC would not seller-finance the transaction if "Wright was involved in any way, shape, or form." Likewise, LoCicero, Riddle, Melling, Grymes, and Jenkins were each present yet had no memory of Gilbert saying anything about Wright during the arbitration. Although there was conflicting testimony about whether Gilbert imposed a condition prohibiting even tangential involvement of Wright, the jury could have chosen to believe the Wardley employees. *See Holbrook Co. v. Adams,* 542 P.2d 191, 193 (Utah 1975) (stat-

---

14. For example, the trial court instructed the jury that GDC's agent, LoCicero, owed GDC the fiduciary duties of full disclosure and obedience.

15. Even if the jury had completed the entire special verdict form, it would never have answered a question designed to elicit whether GDC imposed a sufficiently detailed condition, not based upon any agreement, that Wright could not be involved in any way, shape, or form.

ing the "elemental rule that the fact trier may believe one witness against many, or many against one"). Indeed, the jury's credibility determination could have been impacted by the fact that Fuller is the only real estate agent involved in the transaction whom GDC did not name as a defendant and who continued to represent GDC as the listing agent for its properties at the time of trial. Furthermore, the jury could have found that the admonition that Gilbert did not want to "deal" or "play" with Wright failed to clearly convey that Gilbert wanted to know whether Wright had a business relationship with Butterfield to manage the Zion View property after purchase.

¶ 39 The only witness who supported GDC's claim that it imposed a condition concerning Wright was Fuller, but even she did not understand that Wright could not be involved in any way, shape, or form. Rather, Fuller believed that Wright could not be "the person on the other end of the deal." Fuller's understanding was highlighted by her testimony that, after Gilbert told her about the rumors that Wright was selling lots at Zion View, she "didn't try to see if Dave Wright had been on the project. [She] went to see if Dave Wright was a part of the deal."

¶ 40 Furthermore, all of the evidence in support of GDC's claim that Gilbert informed Defendants that he would not finance the transaction if Wright were involved in any way, shape, or form was presented during the seven-day jury trial. Because the trial court did not direct verdict on the fraudulent nondisclosure claim until the close of evidence, GDC cannot point us to anything not presented at trial that it would have introduced but for the directed verdict. GDC is not entitled to assert the same evidence under a fraudulent nondisclosure cause of action that the jury found insufficient to establish materiality and, therefore, a legal duty to disclose, for purposes of a breach of fiduciary duty claim based upon the same failure to disclose. The jury's answer to question one is fatal to both claims. *See Jensen v. IHC Hosps., Inc.,* 2003 UT 51, ¶ 137, 82 P.3d 1076 (holding that where the jury found that physician was not negligent, a fraudulent concealment claim based on alleged attempts to conceal malpractice also must fail because negligence was a factual predicate of the fraudulent concealment claim); *see also Dishinger v. Potter,* 2001 UT App 209, ¶ 30, 47 P.3d 76 (holding that where the jury's special verdict answers established accord and satisfaction as a matter of law, landlord was precluded from prevailing on an unlawful detainer claim).

C. We Will Not Speculate as to the Content of a Special Verdict on GDC's Fraudulent Nondisclosure Claim.

¶ 41 Finally, GDC contends that trial counsel may have insisted on a different verdict form had the trial court not erroneously directed verdict against GDC on the fraudulent nondisclosure claim. However, GDC has pointed us to nothing that supports this position. We have located no alternative special verdict requested by GDC on the assumption that fraudulent nondisclosure would be submitted to the jury, let alone one that includes separate questions about conditions imposed unilaterally. Nor has GDC offered any explanation why trial counsel would have requested additional special verdict questions if a fraudulent nondisclosure claim had been included, when counsel did not do so despite the submission of the breach of fiduciary duty claim to the jury. Both claims are dependent on a finding that the Wardley employees had a legal duty to disclose Wright's involvement, which GDC contends arose when Gilbert made the information material through his unilateral condition. *See* Restatement (Second) of Torts § 551 cmt. c (1976) (defining materiality as including information that is known to be important due to some peculiarity of the other person); *see also id.* § 538 (defining materiality for purposes of fraudulent misrepresentation as including information known to be regarded by the other person as material, even if not objectively material). Because a question about whether GDC unilaterally imposed a sufficiently definite condition was appropriate in relation to the fiduciary duty claims, whether or not fraudulent nondisclosure was submitted to the jury, we are unconvinced that the special verdict would have been different in the absence of the directed verdict.

¶ 42 GDC's theory that the Wardley employees had a duty to disclose Wright's involvement was predicated on a finding of materiality based upon a condition communicated to them concerning Wright's involvement. GDC agreed that the answer to question one was determinative of whether such a condition was imposed. And GDC consented to, and has not challenged on appeal, the entry of judgment in favor of Defendants on breach of fiduciary duty based on that answer. Consequently, GDC is precluded from arguing that the same evidence supports a different finding for purposes of fraudulent nondisclosure, and any error in granting directed verdict on that claim is harmless. *Cf. Ellis v. Hathaway*, 27 Utah 2d 143, 493 P.2d 985, 986 (1972) (holding that where the plaintiff objected to a special verdict that would have indicated the theory on which the defendant prevailed, the use of an erroneous jury instruction as to one theory of recovery was harmless because "the plaintiff is in no position to complain because he cannot now show that the faulty instruction might have been the cause of an adverse verdict").

## II.  The Attorney Fees Award

¶ 43 We next address GDC's contention that the trial court erred by awarding Defendants their attorney fees and in calculating the amount of those fees. First, we address GDC's challenge to the findings supporting the trial court's award of attorney fees to Defendants. We then consider whether the trial court erred in awarding attorney fees related to Defendants' unsuccessful summary judgment motion and in permitting the fees to be calculated based on Salt Lake City rates as opposed to rates typically charged by attorneys located in St. George.

### A.  Defendants Are Entitled to Their Reasonable Attorney Fees.

¶ 44 "As a general rule, Utah courts award attorney fees only to a prevailing party, and only when such action is permitted by either statute or contract." *Doctors' Co. v. Drezga*, 2009 UT 60, ¶ 32, 218 P.3d 598. The parties agree that under the terms of REPC–2, the prevailing party is entitled to an award of reasonable attorney fees. Be-

cause we have concluded that the trial court properly directed a verdict in favor of Defendants, we affirm the trial court's determination that Defendants are entitled to recover their reasonable attorney fees.

### B.  GDC Failed to Marshal the Evidence Supporting the Trial Court's Reasonableness Findings.

¶ 45 First, GDC maintains that the amount of attorney fees is unreasonable. We grant the trial court significant discretion in determining what constitutes "reasonable" attorney fees because "this issue must be decided against a variety of factual backgrounds," and the trial court is "in a better position than an appellate court to gauge the quality and efficiency of the representation and the complexity of the litigation." *Kraatz v. Heritage Imps.*, 2003 UT App 201, ¶ 56, 71 P.3d 188 (internal quotation marks omitted). In *Dixie State Bank v. Bracken*, 764 P.2d 985 (Utah 1988), the Utah Supreme Court identified some of the factors relevant to the question of whether an award of attorney fees is reasonable, including the complexity or "difficulty of the litigation," "the amount in controversy," the scope of services rendered and the results obtained, "the novelty and difficulty of the issues involved," whether the action was necessary "to vindicate ... rights under the contract," how efficiently the attorneys presented the case, whether the number of hours spent on the case was reasonable, "the fee customarily charged in the locality for similar services," and "the expertise and experience of the attorneys involved." *Id.* at 989; *see also id.* at 990 (stating that, at a minimum, trial courts should consider the amount of "legal work" that "was actually performed," what portion of the work "was reasonably necessary to adequately prosecute the matter," whether "the attorney's billing rate [is] consistent with the rates customarily charged in the locality for similar services," and any "additional factors" that ought to be considered).

¶ 46 Because the trial court's determination that an award is reasonable is necessarily dependent on the underlying facts and circumstances involved, *see id.* at 989–90; *Kraatz*, 2003 UT App 201, ¶ 56, 71 P.3d 188,

a challenge to reasonableness must set forth the evidence supporting the pertinent findings and then show that, despite that evidence, "the particular items billed were so unreasonable that the trial court must, in its discretion, forbid recovery of them." *Kraatz*, 2003 UT App 201, ¶ 60, 71 P.3d 188; *see also* Utah R.App. P. 24(a)(9) ("A party challenging a fact finding must first marshal all record evidence that supports the challenged finding."). This court rejected a challenge to the reasonableness of an award of attorney fees based on the failure to meet this burden in *Kraatz v. Heritage Imports*, 2003 UT App 201, 71 P.3d 188. There, the appellee claimed that charges for time spent "researching the trial judge's reversal rate on appeal," time spent by more than one attorney on the same task, attorney conferences, and noncompensable travel were unreasonable. *See id.* ¶ 60. While the appellees there set forth some, but not all, of the evidence relevant to the reasonableness of these charges, we upheld the award, explaining,

> [Appellee] ignores all of the other evidence supporting the fee award . . . including the duration, difficulty and complexity of the litigation . . ., the overlapping nature of the compensable and noncompensable claims, . . . the evolving nature of the amount in controversy, the necessary financial analysis . . ., the reasons for the number of depositions taken, the experience and expertise of . . . counsel, the necessity of involving multiple attorneys in [Appellant's] representation, and the overall reasonableness of the fee award.

*Id.* (first and third omissions in original) (internal quotation marks omitted). Because the appellee's "marshaling of the evidence in support of the attorney fee award fail[ed] to deal with this evidence," we could not "say the trial court [had] abused its discretion." *Id.* As in *Kraatz*, GDC has failed to acknowledge much of the evidence relevant to the trial court's determination that the amount of the attorney fees awarded to Defendants was reasonable.

¶ 47 GDC asserts that the attorney fees award is unreasonable because it included (1) fees for an unsuccessful summary judgment motion, (2) fees billed at Salt Lake City rather than St. George rates, (3) fees related to the transition in representation from one law firm to another, (4) fees for a mock trial, and (5) fees that had not been apportioned between recoverable and nonrecoverable claims. The trial court rejected those arguments in its "Memorandum Decision And Order Re Award of Attorney[ ] Fees and Costs," expressly noting that the litigation was complex, originally involving ten defendants, asserting multiple claims for relief, and seeking more than six million dollars in damages. The trial court found that GDC's "causes of action were simply different theories of recovery based on the same set of facts" and that defense counsel, who prevailed on all claims as to all Defendants, was therefore not required to separate the time billed among the various causes of action. The memorandum decision also states that counsel for Defendants waived fees incurred by Defendants' former counsel related to the transition between firms and also provided "records and explanation," including an affidavit with a sixty-one page attachment, "sufficient to overcome [GDC's] speculation" that the fees included duplicate work or work on other cases. Furthermore, the trial court made the factual finding that the

> unusually high intensity of the conflict between the parties and the large amount in controversy justified—even necessitated— more than usual trial preparation . . . [such that] the mock trial used by Defendants' counsel to prepare in this case clearly aided in their preparation for the long, difficult jury trial and was a reasonable investment of time.

In rejecting GDC's argument that the fee award was unreasonable, the trial court also relied upon its finding that "GDC's own attorneys . . . vigorously prosecute[d] its claims," incurring, "nearly two years before trial, . . . fees equal to 69% of Defendant[s'] fees for the entire litigation through the jury award."

¶ 48 GDC failed to marshal the evidence in support of these findings or to set forth why, despite that evidence, the trial court abused its broad discretion in evaluating the reasonableness of the fees. Therefore, we decline

to address the merits of GDC's challenges to the reasonableness of the award based upon (1) the transition between law firms; (2) the mock trial; and (3) the allocation of fees between recoverable and nonrecoverable claims.[16] We now consider the merits of GDC's remaining arguments, which are primarily legal questions.

## C. Defendants Are Not Entitled to Attorney Fees for Their Unsuccessful Summary Judgment Motion.

¶ 49 GDC claims that the trial court erred by awarding Defendants attorney fees for an unsuccessful motion for summary judgment Defendants filed in April 2005. In rejecting that argument, the trial court noted that even an unsuccessful summary judgment motion has numerous advantages because it "may produce important evidence," "test the resolve of an opposing party, [test] the party's understanding of the legal issues[ ] and . . . command of the facts," and "reveal facts and issues that were previously unnoticed." Thus, the trial court concluded, "The real issue is whether the time spent by [counsel] . . . was reasonable, and the fact that the [trial c]ourt ruled that the issues should go to a jury is not evidence that the motion was unreasonable."

¶ 50 GDC challenges the trial court's ruling on the basis that prevailing parties "may not recover attorney fees for time spent on an unsuccessful motion." In support of its argument, GDC cites to *ProMax Development Corp. v. Raile*, 2000 UT 4, ¶ 32, 998 P.2d 254 (holding, without discussion, that appellees otherwise entitled to attorney fees incurred at trial and on appeal, "[were] not entitled to fees in pursuing their unsuccessful motion to dismiss th[e] appeal"), and *Cache County v. Beus*, 2005 UT App 503, ¶ 17, 128 P.3d 63 (holding that the trial court erred in awarding the prevailing party all of its attorney fees incurred "from the inception of the case" where those fees included time related to a motion for summary judgment granted by the trial court but reversed on appeal). In response, Defendants claim that nothing

in these decisions expressly holds that a trial court can never award fees incurred pursuing an unsuccessful motion, and instead argue that *Beus* supports a different conclusion. There, the fee award entered by the trial court after remand included fees incurred pursuing the motion for summary judgment granted in the trial court but reversed by the earlier appeal. *See id.* In reversing that attorney fees award, we explained, "Cache County was . . . unsuccessful on appeal [of the summary judgment] and nothing since then has changed the propriety of that ruling." *Id.* (citation omitted).

¶ 51 Defendants contend that in this case, unlike in *Beus*, much has changed since the trial court denied the April 2005 motion for summary judgment. In that motion, Defendants asserted that they were entitled to summary judgment because GDC failed to come forward with facts that could demonstrate proximate cause, GDC's losses were not foreseeable, some of the Defendants did not owe GDC a duty of disclosure, and some of the remaining claims were barred under Utah law. According to Defendants, because GDC later dismissed the claims that Defendants had argued were barred, it is entitled to the fees it incurred in pursuing the earlier motion. We disagree.

¶ 52 "If attorney fees are recoverable by contract, a party is entitled only to those fees attributable to the successful vindication of contractual rights." *Id.* ¶ 16 (emphasis and internal quotation marks omitted). We agree with GDC that the unsuccessful summary judgment motion did not actually lead to a vindication of Defendants' rights under the Listing Agreement; nor did the trial court's findings set forth any connection between the motion and Defendants' ultimate success in the case. While GDC did voluntarily dismiss the claims that Defendants sought to have summarily dismissed as barred, GDC did so two years after Defendants filed their summary judgment motion, and Defendants failed to demonstrate why GDC abandoned the claims at that time. Furthermore, the trial court expressly reject-

---

**16.** With respect to each of these arguments, there is little disagreement between the parties concerning the applicable rules and legal standards; instead, the parties disagree regarding the sufficiency of the evidence to support the trial court's findings of fact on these issues.

ed the proximate cause argument raised as a significant part of the motion, both in its ruling denying summary judgment and when the issue was raised again in Defendants' motion for a directed verdict made after the close of evidence. Accordingly, we reverse the trial court's attorney fees award and remand with instructions to subtract the fees incurred pursuing the unsuccessful motion for summary judgment.

D. The Trial Court Acted Within Its Discretion in Awarding Fees Based on Salt Lake City Rates.

¶ 53 Finally, we address GDC's contention that the trial court erred in awarding attorney fees based on the hourly rates charged by Salt Lake City attorneys rather than rates charged by attorneys in St. George, where the case was tried. In *Dixie State Bank v. Bracken,* 764 P.2d 985 (Utah 1988), the supreme court held that one of the factors the trial court should consider in evaluating the reasonableness of an award of attorney fees is whether "the attorney's billing rate [is] consistent with the rates customarily charged in the *locality* for similar services." *Id.* at 990 (emphasis added). GDC argues that the term "locality," as used in *Bracken,* refers to the "immediate geographic proximity" of the trial court. Thus, GDC maintains, the trial court should have awarded attorney fees based on the prevailing rate in the St. George area. There is sparse Utah authority regarding what the relevant locality is for purposes of determining an appropriate billing rate for legal services; indeed, we have found no decision from either of our appellate courts addressing this issue.

¶ 54 In support of its argument that the interpretation of locality should be limited to St. George, GDC first cites one dictionary, which defines locality as "a place, district, [or] neighborhood." Webster's New World College Dictionary 842 (4th ed.2004). However, the term "place," as used by GDC, has been defined as broadly as "an indefinite region or expanse," or "a particular region, center of population, or location." Merriam-Webster Online, http://www.merriam-webster.com/dictionary/place (last visited Aug. 26, 2010). Moreover, Black's Law Dic-

tionary defines locality as a "definite region; vicinity; neighborhood; community," Black's Law Dictionary 1022 (9th ed.2009), with "community" being defined as a "society or group of people with similar rights or interests," *id.* at 317; *see also* Webster's Third New International Dictionary 1327 (1986) (defining locality as "a particular spot, situation, or location," "a place having a particular feature," or "a political subdivision of a state"). Therefore, because a locality could be defined as narrowly as a neighborhood, or as broadly as a region or a group with common interests, we do not agree with GDC that the plain meaning of the term limits the trial court's discretion to an award of attorney fees based solely on the prevailing rates in St. George.

¶ 55 GDC next cites various cases it claims demonstrate that "courts consistently narrow the geographic reach of the locality when determining the market rate." While courts in some jurisdictions have limited locality to the specific metropolitan area where the cases were tried, they did so in those cases because attorneys with the necessary skills and experience were readily available in the surrounding area. *See Coulter v. Tennessee,* 805 F.2d 146, 149 (6th Cir.1986); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 955–56 (1st Cir.1984); *Gratz v. Bollinger,* 353 F.Supp.2d 929, 946 (E.D.Mich.2005). In contrast, some courts have permitted an attorney fees award based on rates that were higher than the prevailing rates in the immediately surrounding area where either the attorneys involved had specialized experience or the local attorney pool lacked the necessary skill and experience to try the case effectively. *See Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983); *see also Grendel's Den,* 749 F.2d at 955–56.

¶ 56 Rather than adopting a per se rule requiring that, in every case, the rate awarded must be based on the prevailing rate in the immediately surrounding vicinity, we conclude that a better approach was articulated by the First Circuit Court of Appeals in *Maceira v. Pagan,* 698 F.2d 38 (1st Cir. 1983). There, the First Circuit held, "Where it is unreasonable to select a higher priced outside attorney—as, for example, in an ordi-

nary case requiring no specialized abilities not amply reflected among local lawyers—the local rate is the appropriate yardstick." *Id.* at 40. However, if the party "needs to go to a different city to find [a] specialist, he will expect to pay the rate prevailing in that city. In such a case, there is no basis for concluding that the specialist's ordinary rate is unreasonably high." *Id.* That approach accords with Utah case law that states that the reasonable value of an attorney's services

> may depend upon a number of factors, including his background of learning and experience, his ability, his integrity and his dedication to the causes with which he identifies himself. Also to be considered is the reputation he has acquired, the nature and importance of the matter, and the amount of money or value of property involved. There is also the matter as to how the lawyer is to be paid: cash in advance, extended credit, whether a fixed amount, or contingent on success, or other conditions.

*Kerr v. Kerr*, 610 P.2d 1380, 1385 (Utah 1980) (footnote omitted).

¶ 57 Because each case involves its own set of unique facts and legal issues, the question of whether the matter required the assistance of counsel from outside the specific local area is, of necessity, a fact-dependent inquiry.[17] The trial court is in the best position to assess the reasonableness of the rate sought, due to the trial court's greater familiarity with the factual and legal intricacies of the case, the skills and experience of attorneys in the local bar, and the actual performance of the attorneys involved in the litigation. Accordingly, we conclude that the trial court has discretion to award attorney fees based on a higher rate than that prevailing in the immediately surrounding area, where the party seeking the award shows that it was reasonably necessary to obtain counsel from another city.

¶ 58 Applying that rule to the facts of this case, we hold that the trial court did not abuse its discretion in entering the attorney fees award based on Salt Lake City rates. The trial court explained that "this case was somewhat unusual in its factual and legal complexity," that the work done by the attorneys "ha[d] been exemplary," and that Defendants' counsel, in particular, "was especially well prepared, professional, skillful, expert, and effective." Under these circumstances, we cannot say that the trial court erred in concluding that the use of Salt Lake City rates was reasonable in this case. Furthermore, because Defendants have also prevailed on appeal, they are entitled to their reasonable fees incurred in this court. *See Management Servs. Corp. v. Development Assocs.*, 617 P.2d 406, 409 (Utah 1980) ("[A] provision for payment of attorney[ ] fees in a contract includes attorney[ ] fees incurred by the prevailing party on appeal. . . .").

## CONCLUSION

¶ 59 Even assuming that by clearly communicating his condition that Wright not be involved in any way, shape, or form, Gilbert could make that condition material, the jury found that GDC did not, by the terms of any agreement, condition its participation on Wright having no involvement with REPC–2. GDC agreed that the absence of such a finding necessarily led to the legal conclusion that none of the Wardley employees had a duty to disclose Wright's involvement and that judgment against it on the breach of fiduciary duty claim was consistent with the jury's finding. GDC's claim of fraudulent nondisclosure is also dependent on a finding that GDC imposed a condition that Wright could not be involved; that condition serves as the factual predicate to establish the Wardley employees' legal duty to disclose information about Wright's involvement with Butterfield. Thus, the jury's finding and the judgment based on that finding are fatal to both claims, and the question of whether the trial court correctly granted directed verdict is moot.

¶ 60 As the prevailing party under the Listing Agreement's attorney fees provision, Defendants are entitled to their reasonable attorney fees, including those incurred on appeal, *see id.* GDC did not properly mar-

---

**17.** Here, both parties are represented by Salt Lake City law firms, although the Salt Lake City firm representing Gilbert also operates a branch office in St. George.

shal the evidence supporting the trial court's findings underlying its determination that the fees sought by Defendants were reasonable. Furthermore, the trial court did not err in awarding Defendants attorney fees based on Salt Lake City rates but did improperly award Defendants the attorney fees incurred in pursuing an unsuccessful motion for summary judgment. Accordingly, we reverse the trial court's entry of the attorney fees award and remand for a revised award that does not include fees incurred for the unsuccessful summary judgment motion, but which does include Defendants' reasonable attorney fees incurred on appeal. We affirm the trial court's decision in all other respects.

¶ 61 Affirmed in part, reversed and remanded in part.

¶ 62 WE CONCUR: GREGORY K. ORME and J. FREDERIC VOROS JR., Judges.